# EXHIBIT 2

NOTICE OF SUIT TO SHERIFF OF ALLEGHENY CO.
You are hereby notified that on __11/17/2015__
a COMPLAINT has been filed in this case
and you are required to serve the same on or before the
__12/17/2015__
Kate Barkman, Director
Department of Court Records

## COMPLAINT IN CIVIL ACTION

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| Plaintiff(s) Nagel, Harry C. | Case Number : GD - 15 - 020170 |
|---|---|
| | Type of pleading: **COMPLAINT** |
| | Filed on behalf of: **Harry C. Nagel** <br><br> **Mark T Vuono** <br> (Name of the filing party) |
| **Vs** <br><br> Defendant(s) **Siemens Industry Inc.** <br> **Siemens Rail Automation Carborne Systems Inc.** <br> **Siemens Rail Automation Corporation** | [ X ] Counsel of Record <br><br> [ ] Individual, If Pro Se |
| | Name, Address and Telephone Number : <br> **Mark T Vuono** <br> **Vuono Lavelle & Gray** <br> **2310 Grant Building** <br> **Pittsburgh , PA 15219** <br> **412 471-1800** |
| | Attorney's State ID: 33351 |

Kate Barkman, Director, Department of Court Records

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet
_____ County
ALLEGHENY

For Prothonotary Use Only:

Docket No:

TAIL STAMP

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**Commencement of Action:**
☒ Complaint   ☐ Writ of Summons   ☐ Petition
☐ Transfer from Another Jurisdiction   ☐ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| HARRY C. NAGEL | SIEMENS INDUSTRY, INC. et al. |

| | | |
|---|---|---|
| **Are money damages requested?** ☒ Yes   ☐ No | Dollar Amount Requested: (check one) | ☐ within arbitration limits ☒ outside arbitration limits |

| | |
|---|---|
| **Is this a *Class Action Suit*?** ☐ Yes   ☒ No | **Is this an *MDJ Appeal*?**   ☐ Yes   ☒ No |

Name of Plaintiff/Appellant's Attorney: MARK T. VUONO, ESQ. AND DENNIS J. KUSTURISS, ESQ.

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**Nature of the Case**: Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
☐ Intentional
☐ Malicious Prosecution
☐ Motor Vehicle
☐ Nuisance
☐ Premises Liability
☐ Product Liability *(does not include mass tort)*
☐ Slander/Libel/ Defamation
☐ Other:
_____

**MASS TORT**
☐ Asbestos
☐ Tobacco
☐ Toxic Tort - DES
☐ Toxic Tort - Implant
☐ Toxic Waste
☐ Other:
_____

**PROFESSIONAL LIABLITY**
☐ Dental
☐ Legal
☐ Medical
☐ Other Professional:
_____

**CONTRACT** *(do not include Judgments)*
☐ Buyer Plaintiff
☐ Debt Collection: Credit Card
☐ Debt Collection: Other
_____

☐ Employment Dispute: Discrimination
☒ Employment Dispute: Other Breach of Employment Agreement

☐ Other:
_____

**REAL PROPERTY**
☐ Ejectment
☐ Eminent Domain/Condemnation
☐ Ground Rent
☐ Landlord/Tenant Dispute
☐ Mortgage Foreclosure: Residential
☐ Mortgage Foreclosure: Commercial
☐ Partition
☐ Quiet Title
☐ Other:
_____

**CIVIL APPEALS**
Administrative Agencies
☐ Board of Assessment
☐ Board of Elections
☐ Dept. of Transportation
☐ Statutory Appeal: Other
_____

☐ Zoning Board
☐ Other:
_____

**MISCELLANEOUS**
☐ Common Law/Statutory Arbitration
☐ Declaratory Judgment
☐ Mandamus
☐ Non-Domestic Relations Restraining Order
☐ Quo Warranto
☐ Replevin
☐ Other:
_____

*Updated 1/1/2011*

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CIVIL DIVISION

HARRY C. NAGEL

           Plaintiff,

           v.

SIEMENS INDUSTRY, INC., SIEMENS
RAIL AUTOMATION CARBORNE
SYSTEMS, INC., AND SIEMENS RAIL
AUTOMATION CORPORATION,

           Defendants.

Case No. GD *-15-20170*

Type of Pleading:

**COMPLAINT**

Code:  010

FILED ON BEHALF OF:

HARRY C. NAGEL

NAME, ADDRESS AND
TELEPHONE NUMBER OF
COUNSEL OF RECORD:

Mark T. Vuono, Esq.
State I.D. No. 33351

Dennis J. Kusturiss, Esq.
State I.D. No. 28003

VUONO & GRAY, LLC
310 Grant Street, Suite 2310
Pittsburgh, PA  15219
(412) 471-1800

Firm No. 298

**<u>JURY TRIAL DEMANDED</u>**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CIVIL DIVISION

| | | |
|---|---|---|
| HARRY C. NAGEL | ) | |
|      Plaintiff, | ) | |
| | ) | |
|      v. | ) | No. GD_____ |
| | ) | |
| SIEMENS INDUSTRY, INC., SIEMENS | ) | |
| RAIL AUTOMATION CARBORNE | ) | **COMPLAINT** |
| SYSTEMS, INC., AND SIEMENS RAIL | ) | |
| AUTOMATION CORPORATION, | ) | |
| | ) | |
|      Defendants. | ) | |

## NOTICE TO DEFEND

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within TWENTY (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**LAWYER REFERRAL SERVICE**
**Allegheny County Bar Association**
**11th Floor Koppers Building**
**436 Seventh Avenue**
**Pittsburgh, PA 15219**
**Telephone: (412) 261-5555**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CIVIL DIVISION

| | | |
|---|---|---|
| HARRY C. NAGEL | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. GD_____ |
| | ) | |
| SIEMENS INDUSTRY, INC., SIEMENS | ) | |
| RAIL AUTOMATION CARBORNE | ) | |
| SYSTEMS, INC., AND SIEMENS RAIL | ) | |
| AUTOMATION CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff, Harry C. Nagel, ("Nagel") by and through his attorneys, Vuono & Gray, LLC, has caused this Complaint to be filed and states as follows:

1.      Plaintiff Nagel is an adult individual who resides at 3000 McCully Road, Allison Park, Allegheny County, Pennsylvania 15101.

2.      Defendant Siemens Industry, Inc. is a Delaware corporation which is registered to do business in the Commonwealth of Pennsylvania and which maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

3.      Defendant Siemens Rail Automation Carborne Systems, Inc. is a Pennsylvania corporation which maintains a registered office address at 664 Linden Avenue, East Pittsburgh, Allegheny County, Pennsylvania 15112.

4.      Defendant Siemens Rail Automation Corporation is a Delaware corporation which maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

5.      Upon information and belief, the Defendants' involvement in this action is due to the following transactions:

5.1     Prior to May 9, 2012, Nagel was one of two owners of PHW, Inc. ("PHW"), a Pennsylvania corporation engaged in the business of manufacturing electronic train control and signaling systems;

5.2     On or about May 9, 2012, Invensys Rail Corporation ("Invensys") purchased all of the shares of PHW from Nagel and John R. Harrison pursuant to a Stock Purchase Agreement ("SPA"). A true and correct copy of the SPA is attached hereto as Exhibit A;

5.3     On or around May 2, 2013, Siemens Industry, Inc. ("SII")  acquired Invensys and its subsidiaries, including PHW, and after this acquisition, Siemens Rail Automation Carborne Systems, Inc. ("SRACS") became the new name of PHW, and Siemens Rail Automation Corporation became the successor in interest to Invensys; and

5.4     Siemens Rail Automation Corporation ("Siemens Rail") does business in Pennsylvania and has registered the fictitious names "Invensys Rail North America" ("IRNA") and "Invensys Rail."

6.     On or about May 9, 2012, in connection with the SPA, Nagel entered into an agreement with IRNA pursuant to which he would be employed by PHW as part of the IRNA business unit ("Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit B.

7.     The Employment Agreement provided that Nagel's title was to be BU Senior General Manager of the PHW business unit, with the external title of Vice President, General Manager of the PHW business unit.

8.     The Employment Agreement provides in Section 5 that if Nagel resigns from his employment for "Good Reason" during a period of greater than two (2) years but less than three

2

(3) years from the date his employment commenced, he would be entitled to severance benefits in the form of two (2) years of his base salary as of the effective date of his termination ("Severance Pay") and medical and dental coverage under COBRA, with premiums paid by the employer for the first six (6) months after the date of his termination ("Health Benefits").

9.      Nagel's final annual base salary was Two Hundred and Thirteen Thousand, One Hundred Ninety-Three Dollars ($213,193). SII is the entity that issued Nagel's paychecks and W-2s.

10.     The Employment Agreement states that "Good Reason" for Nagel to terminate his employment includes "a material diminution to your [Nagel's] title, salary or authority, unless such diminution is based on your poor performance as previously documented in writing by IRNA."

11.     The Employment Agreement also provides that "material diminution in your authority shall include a material change in your duties as described in Section 4 ("Duties") above."

12.     The Employment Agreement further provides that a condition

> shall not constitute Good Reason for termination unless (i)
> you provide written notice to IRNA of the condition
> claimed to constitute grounds for Good Reason within
> thirty (30) days of the initial existence of the condition, and
> (ii) the condition is not remedied within fifteen (15) days of
> such notice. In circumstances where the condition is a
> gradual one that does not arise from one specific incident,
> you need to give Invensys written notice as soon as
> possible and Invensys shall have thirty (30) days to cure
> such condition.

13.     Pursuant to Section 4 of the Employment Agreement, Nagel's duties included:

> general control over the P&L [profit and loss] of the PHW
> Business Unit including but not limited to...(ii) primary
> interface to PHW customers, including existing and new

3

PHW customers obtained during your term as General Manager, (iii) decision making authority to determine on which projects to bid on or engage in and to staff, manage and allocate resources from the PHW business unit for such projects accordingly, and (iv) participate in negotiations of contract requirements, terms and conditions.

14.     Defendants are bound by the terms of the Employment Agreement as the successors in interest to PHW and Invensys, as explained in Paragraph 5 above.

15.     After acquiring Invensys, SII began reorganizing and restructuring the former Invensys and PHW business units to integrate them into its corporate structure.

16.     After the SII acquisition, Nagel's authority was materially diminished from his recognized duties under the Employment Agreement as outlined in Paragraph 13 above. The diminutions included, but were not limited to, the following:

16.1     Nagel's former Production and Project Managers were reassigned and required to report to new managers;

16.2     The Production Manager who had previously reported to Nagel was required to sign a confidentiality agreement which prohibited and excluded him from discussing a proposed relocation of production operations with Nagel;

16.3     Nagel lost control over the profit and loss for the former PHW business unit;

16.4     Nagel lost control of the location of manufacturing production;

16.5     Nagel lost the ability to work with SEPTA, a major PHW customer;

16.6     The refusal by project management to pursue schedule changes with external partners working on Project 26938-US-RA-US-NY-MTA PTC ("MTA PTC"), a significant PHW project;

4

16.7    The loss of control over contract terms and negotiations on the ATC MNR P38/Shoreliner project;

16.8    The Technical Project and Commercial Project Managers for SII, who were not employed by PHW, delegated full management responsibility over the MTA PTC project without consulting or notifying Nagel;

16.9    Nagel's loss of personnel, control, and spending authority with respect to information technology;

16.10   Nagel's loss of control with respect to supply chain management/procurement, and the misuse and mismanagement of its personnel;

16.11   Nagel's loss of control with respect to operations and his inability to fulfill contract delivery obligations with SEPTA, a major customer, and other customers; and

16.12   Nagel's loss of authority over accounting decisions and the loss of authority to pursue capital expenditures.

17.    On or about February 14, 2014, Nagel provided written notice to SRACS that he had experienced material diminutions in his authority and that they constituted Good Reason for his resignation ("Notice"). A true and correct copy of the Notice is attached hereto as Exhibit C.

18.    On or about February 25, 2014, John Paljug ("Paljug"), in his capacity as CEO of Siemens Rail, replied to Nagel's Notice and denied that the changes in Nagel's conditions constituted Good Reason for Nagel to terminate his employment, and attempted to explain how the various organizational changes that had occurred were necessary and beneficial. A true and correct copy of this letter is attached hereto as Exhibit D.

19.    On or about July 13, 2014, Nagel emailed Paljug and Kim Taylor concerning evidence of his materially diminished responsibilities as revealed by an audit in May of 2014 of

5

the former PHW business unit. A true and correct copy of the July 13 email is attached hereto as Exhibit E.

20. Nagel noted that the material diminishment of his management duties was established by the May, 2014 audit report, which stated, among other things, that it had been distributed to the management of the reviewed unit, yet had not been sent to Nagel, and that payment approval instructions had been sent to PHW management, yet had not been sent to Nagel. Nagel requested evidence that he still had control over the purchasing and manufacturing departments, as provided for in the Employment Agreement. (See Exhibit E.)

21. On or about July 29, 2014, Paljug again denied that there had been a material change in Nagel's duties or authority and chastised Nagel for putting his concerns in writing (as required under the Employment Agreement) rather than asserting them in a "productive manner." A true and correct copy of this letter is attached hereto as Exhibit F.

22. Nagel put Defendants on written notice on February 14, 2014 and July 14, 2014 (See Exhibits C and E) of his materially diminished authority in letters as required by Section 5 of the Employment Agreement and Defendants failed to cure or even acknowledge the existence of the issues raised by Nagel.

23. Defendants have never documented or suggested that Nagel's materially diminished authority was due to poor performance.

24. Nagel did not provide written consent for any of the material diminutions to his authority until after he wrote a letter on or about January, 2015, which recognized that his replacement would be assuming his authority to act.

6

25.     Under the circumstances, the changes in the conditions of Nagel's employment brought on prior to January, 2015, and continuing throughout the remainder of Nagel's employment, constituted Good Reason for him to resign.

26.     On or about April 3, 2015, Nagel resigned for Good Reason, entitling him to Severance Pay and Health Benefits pursuant to Section 5 of the Employment Agreement.

## COUNT I

## BREACH OF CONTRACT

27.     Plaintiff Nagel incorporates the averments of paragraphs 1-26 herein as though fully set forth at length.

28.     Pursuant to Sections 1 and 5 of the Employment Agreement, Defendants are required to continue payment of Nagel's base salary in the amount of Two Hundred and Thirteen Thousand, One Hundred Ninety-Three Dollars ($213,193) from the effective date of his termination for a period of two years, and to pay the employee rates for medical and dental coverage for Nagel for six months following his termination.

29.     Defendants have breached the Employment Agreement by failing or refusing to timely make payments of Severance Pay and Health Benefits due under the Employment Agreement.

WHEREFORE, Plaintiff Nagel requests that this Honorable Court enter judgment in his favor and against Defendants Siemens Industry, Inc., Siemens Rail Automation Carborne Systems, Inc., and Siemens Rail Automation Corporation in an amount in excess of $35,000, plus costs and interest.

## COUNT II

## WAGE PAYMENT AND COLLECTION LAW

30.     Plaintiff Nagel incorporates the averments of paragraphs 1-29 herein as though fully set forth at length.

31.     Salary payments and the value of continued health insurance benefits owed to Nagel by reason of his resignation for Good Reason are wages as defined by the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.2a.

32.     Defendants have failed to make the continued salary payments to Nagel or to continue his health insurance benefits in accordance with the Employment Agreement in violation of the Wage Payment and Collection Law, 43 P.S. § 260.3.

33.     Defendants' refusal to pay Severance Pay to Nagel within thirty (30) days of each regularly scheduled payday and to continue his health insurance despite the fact that no good faith dispute exists as to Nagel's right to such pay entitles Nagel to recover liquidated damages in the amount of twenty-five percent (25%) of the compensation due, pursuant to the Wage Payment and Collection Law, 43 P.S. § 260.10.

34.     In accordance with the Wage Payment and Collection Law, § 260.9a(f), Nagel is entitled to recover, in addition to the unpaid wages and the value of the health insurance benefits, attorney's fees incurred in connection with the prosecution of his unpaid wage claim.

WHEREFORE, Plaintiff Nagel requests that this Honorable Court enter judgment in his favor and against Defendants Siemens Industry, Inc., Siemens Rail Automation Carborne Systems, Inc., and Siemens Rail Automation Corporation, in an amount in excess of $35,000, plus costs, interest, liquidated damages and attorney's fees.

Respectfully submitted,

VUONO & GRAY, LLC

By:_____
    Mark T. Vuono, Esq.
    PA I. D. No. 33351
    Dennis J. Kusturiss, Esq.
    PA I.D. No. 28003
      Attorneys for Plaintiff

VUONO & GRAY, LLC
310 Grant Street, Suite 2310
Pittsburgh, PA  15219
(412) 471-1800
Dated:  November 17, 2015
/157422

9

## **VERIFICATION**

I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: **11/16/15**

Harry C. Nagel

1

# EXHIBIT A

**EXECUTION VERSION**

**STOCK PURCHASE AGREEMENT**
**by and among**

**Invensys Rail Corporation**

**as Purchaser,**

**and**

**John R. Harrison**

**and**

**Harry C. Nagel**

**May 9, 2012**

## TABLE OF CONTENTS

Page

ARTICLE 1        CERTAIN DEFINITIONS ......................................................................... 1

    Section 1.1        Certain Definitions............................................................... 1

ARTICLE 2        PURCHASE AND SALE.......................................................................... 11

    Section 2.1        Purchase and Sale of the Shares............................................ 11
    Section 2.2        Estimated Closing Purchase Price ........................................ 12
    Section 2.3        Post-Closing Audit; Dispute Resolution............................... 12
    Section 2.4        Contingent Consideration ...................................................... 14

ARTICLE 3 ·      CLOSING ............................................................................................ 17

    Section 3.1        Delivery and Actions by Sellers at Closing.......................... 17
    Section 3.2        Delivery and Actions by Purchaser at Closing ..................... 18

ARTICLE 4        REPRESENTATIONS AND WARRANTIES OF SELLERS
                  REGARDING SELLERS ...................................................................... 18

    Section 4.1        Authority ............................................................................... 18
    Section 4.2        Title to Shares ....................................................................... 18
    Section 4.3        Non-contravention................................................................. 18
    Section 4.4        Consents................................................................................ 19
    Section 4.5        Litigation............................................................................... 19
    Section 4.6        Brokers.................................................................................. 19

ARTICLE 5        REPRESENTATIONS AND WARRANTIES OF SELLERS
                  REGARDING THE COMPANY .......................................................... 19

    Section 5.1        Organization and Good Standing........................................... 19
    Section 5.2        Authority................................................................................ 19
    Section 5.3        No Conflicts........................................................................... 19
    Section 5.4        Consents................................................................................ 20
    Section 5.5        Capitalization ........................................................................ 20
    Section 5.6        No Subsidiaries..................................................................... 21
    Section 5.7        Financial Matters .................................................................. 21
    Section 5.8        Material Contracts................................................................. 22
    Section 5.9        Title to Assets; No Liens....................................................... 24
    Section 5.10       Real Property ........................................................................ 24
    Section 5.11       Intellectual Property.............................................................. 26
    Section 5.12       Information Technology ........................................................ 27
    Section 5.13       Litigation............................................................................... 27
    Section 5.14       Customers and Suppliers....................................................... 27
    Section 5.15       Compliance with Laws and Regulations; Permits ................ 28
    Section 5.16       Brokers.................................................................................. 28
    Section 5.17       Environmental Matters.......................................................... 28

DM_US 31372147-16.054265.0520

Section 5.18     Employee Matters ...................................................... 29
Section 5.19     Employee Benefit Plans .............................................. 30
Section 5.20     Sufficiency of Assets .................................................. 32
Section 5.21     Affiliate Transactions.................................................. 32
Section 5.22     Insurance...................................................................... 32
Section 5.23     Taxes............................................................................. 33
Section 5.24     Absence of Certain Developments............................ 35
Section 5.25     Products; Product Liability ........................................ 37
Section 5.26     Absence of Certain Payments ................................... 37
Section 5.27     Acquisition Proposals ................................................ 37
Section 5.28     Bank Accounts ........................................................... 37

ARTICLE 6        REPRESENTATIONS AND WARRANTIES OF PURCHASER............... 38

Section 6.1      Organization................................................................. 38
Section 6.2      Authority...................................................................... 38
Section 6.3      Non-contravention...................................................... 38
Section 6.4      Consents....................................................................... 38
Section 6.5      Litigation...................................................................... 38
Section 6.6      Brokers ......................................................................... 38

ARTICLE 7        PRE-CLOSING COVENANTS ...................................... 39

Section 7.1      Access to Information.................................................. 39
Section 7.2      Conduct of Business Prior to the Closing Date ........ 39
Section 7.3      Commercially Reasonable Efforts .............................. 41
Section 7.4      No Negotiation............................................................ 42
Section 7.5      Notification.................................................................. 42
Section 7.6      Affiliate Agreements................................................... 42

ARTICLE 8        CONDITIONS PRECEDENT ...................................... 43

Section 8.1      Conditions to Each Party's Obligations to Effect the Closing.......... 43
Section 8.2      Conditions to Purchaser's Obligation to Effect the Closing............. 43
Section 8.3      Conditions to Sellers' Obligation to Effect the Closing .................. 44

ARTICLE 9        POST-CLOSING COVENANTS AND AGREEMENTS .......................... 44

Section 9.1      Public Announcements; Confidentiality...................... 44
Section 9.2      Transfer Taxes ............................................................ 45
Section 9.3      Tax Matters ................................................................. 45
Section 9.4      Employee Matters ....................................................... 48
Section 9.5      Confidential Information ............................................. 48
Section 9.6      Employee Non-Solicitation......................................... 48
Section 9.7      Non-Competition ........................................................ 49

ARTICLE 10       SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
                 INDEMNIFICATION........................................................ 49

Section 10.1     Survival of Representations and Warranties.............. 49

Section 10.2     Indemnification by Sellers ........................................................ 50
Section 10.3     Indemnification by Purchaser ................................................... 51
Section 10.4     Additional Provisions Regarding Indemnification Obligations ........ 51
Section 10.5     Set-Off ............................................................................... 53
Section 10.6     Alstom Claims ...................................................................... 53

ARTICLE 11     TERMINATION ................................................................... 54

Section 11.1     Termination .......................................................................... 54
Section 11.2     Procedure and Effect of Termination ......................................... 54

ARTICLE 12     MISCELLANEOUS ............................................................... 55

Section 12.1     Entire Agreement; Assignment .................................................. 55
Section 12.2     Notices ................................................................................ 55
Section 12.3     Governing Law ...................................................................... 56
Section 12.4     Construction; Interpretation ..................................................... 57
Section 12.5     Company Disclosure Schedule .................................................. 57
Section 12.6     Parties in Interest .................................................................. 57
Section 12.7     Severability .......................................................................... 57
Section 12.8     Counterparts; Facsimile Signatures ........................................... 58
Section 12.9     Jurisdiction and Venue ........................................................... 58
Section 12.10    Remedies ............................................................................. 58
Section 12.11    Further Assurances ................................................................ 58
Section 12.12    Failure or Indulgence not Waiver .............................................. 58
Section 12.13    Amendments ........................................................................ 58
Section 12.14    Fees and Expenses ................................................................ 59
Section 12.15    Sellers' Representative ........................................................... 59

## EXHIBITS

Exhibit A —   Form of Harrison Employment Agreement
Exhibit B —   Form of Lease Agreement
Exhibit C —   Form of Nagel Employment Agreement
Exhibit D —   Form of Release of Claims
Exhibit E —   Allocation Schedule

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of May 9, 2012, is made and entered into by and among Invensys Rail Corporation, a Delaware corporation ("Purchaser"), and each of John R. Harrison, individually ("Harrison") and Harry C. Nagel, individually ("Nagel"; together with Harrison, "Sellers").

## RECITALS

WHEREAS, Sellers are the shareholders of PHW Inc., a Pennsylvania corporation (the "Company"), and own beneficially and of record all of the issued and outstanding shares of common stock of the Company, which consist of 6,266 shares (the "Shares");

WHEREAS, Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers, all of the Shares upon the terms and subject to the conditions herein; and

WHEREAS, the Parties desire to enter into, or to cause their applicable Affiliates to enter into, the Transaction Documents, and to perform their obligations thereunder.

NOW, THEREFORE, in consideration of the representations, warranties and covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE 1

## CERTAIN DEFINITIONS

Section 1.1    Certain Definitions.  As used in this Agreement, the following terms have the respective meanings set forth below.

"Accounting Firm" has the meaning ascribed thereto in Section 2.3(b).

"Acquisition Proposal" means any sale or other disposition (whether by merger, reorganization, recapitalization or otherwise) of all or a substantial part of the capital stock or assets of the Company.

"Additional Purchase Price Adjustment" means an amount equal to the sum of (a) the Company's Indebtedness other than the Performance Bonds as of the Closing Date, plus (b) any Company Expenses that are unpaid as of the Closing Date.

"Affiliate" of any Person, means any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person.   As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by Contract or otherwise).

"Agreement" has the meaning ascribed thereto in the Preamble.

"Allocation" has the meaning ascribed thereto in Section 9.3(f)(ii).

"Alstom" means both GEC Alsthom Transportation, Inc. and Alstom Signaling Inc.

"Balance Sheet" has the meaning ascribed thereto in Section 5.7(a).

"Business" means the business of designing, developing, manufacturing, marketing and selling custom engineered electronics systems and related products and services for rail and mass transit applications.

"Business Day" means a day, other than a Saturday or Sunday or any other day on which commercial banking institutions in New York City, or London are not open for the transaction of normal banking business.

"Cap" has the meaning ascribed thereto in Section 10.4(a).

"Closing" has the meaning ascribed thereto in Article 3.

"Closing Date" means May 9, 2012 or such later date that all the conditions set forth in Article 8 are satisfied or waived (other than conditions that by their terms are to be satisfied by action or delivery at the Closing).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning ascribed thereto in the Recitals.

"Company Disclosure Schedule" means the disclosure schedule and exhibits thereto that have been delivered to Purchaser with the execution and delivery of this Agreement.

"Company Expenses" means all of the fees and expenses incurred by or billed to the Company in connection with the preparation, negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby or any other similar potential transactions with other third parties, including, without limitation: (a) legal fees and disbursements and related expenses; (b) the fees and expenses of any other agents, advisors, consultants and experts employed by the Company or Sellers in connection with such transactions; and (c) any special bonuses, transaction bonuses, change in control bonuses, phantom stock bonuses or other bonus payments to any employee of the Company, and any Taxes payable by the Company in respect thereof.

"Company Intellectual Property" means any and all Intellectual Property that is owned by or exclusively licensed to the Company.

"Company Registered Intellectual Property" means the applications, registrations and filings for Intellectual Property that have been registered, filed, certified or otherwise perfected or recorded, with or by any Governmental Authority, by or in the name of the Company (including, without limitation, all Internet domain names).

2

"Confidential Information" has the meaning ascribed thereto in Section 9.5.

"Consent" means any approval, consent, license, permit, waiver, registration or other authorization issued, granted or given by or under the authority of a Governmental Authority or any other Person.

"Contingent Consideration" has the meaning ascribed thereto in Section 2.4(a).

"Contingent Consideration Payment" has the meaning ascribed thereto in Section 2.4(a).

"Contingent Consideration Payment Statement" has the meaning ascribed thereto in Section 2.4(b).

"Contract" means any written or oral agreement, contract, subcontract, lease, binding understanding, indenture, note, guaranty, option, warranty, purchase order, license, sublicense, insurance policy, benefit plan or legally binding commitment or undertaking of any nature (and all amendments, modifications or supplements thereto).

"Dispute Notice" has the meaning ascribed thereto in Section 2.4(c).

"EBITDA" means, for the relevant Measurement Period, the amount equal to the sum of (a) Net Income during such period, plus (b) to the extent (but only to the extent) deducted in determining such Net Income, without duplication, (i) all interest expense for such period, (ii) all charges against Net income for such period for federal, state and local income Taxes, (iii) all depreciation expenses for such period, and (iv) all amortization expenses for such period, and minus (c) to the extent (but only to the extent) included in determining such Net income (i) all interest income during such period, and (ii) any extraordinary, unusual or non-recurring or non-cash income or gains (including gains on the sales of assets outside of the ordinary course of business). If the Company or any of its subsidiaries engages in a subsequent acquisition, joint venture (other than a subcontractor or similar arrangement in the ordinary course of business to provide products or services to a customer on a joint basis with others), disposition or similar transaction prior to the end of the last Measurement Period, then EBITDA will be calculated without giving effect to any item (a) through (c) generated by, resulting from or related to such acquisition, joint venture, disposition or similar transaction (or the business acquired thereby). To the extent that Purchaser or any Affiliate of Purchaser has taken over an administrative function that was previously performed by the Company, a reasonable overhead charge that reflects the cost to perform that function shall be allocated to the general and administrative expense of the Company for purposes of calculating EBITDA. Likewise, to the extent Purchaser imposes an administrative or similar charge on, or performs an administrative function for, the Company that does not relate to the Company's business, a reasonable overhead charge that reflects the cost to perform that function shall be deducted from the general and administrative expense of the Company for purposes of calculating EBITDA.

"EBITDA Target" means the EBITDA target specified in Section 2.4.

"Employee Benefit Plan" means each Plan under which the Company has any obligation or Liability to provide benefits or compensation to or for the benefit of any current or former

· 3

employees, consultants or directors of such entity, or the spouses, beneficiaries or other dependents thereof.

"Employment Condition" has the meaning ascribed thereto in Section 2.4.

"Environmental Claims" means, in respect of any Person, (a) any and all administrative, regulatory or judicial actions, Orders, decrees, suits, demands, directives, claims, Liens, investigations, proceedings or notices of noncompliance, Liability or violation by any Governmental Authority or other Person alleging Liability arising out of, based on or related to any Environmental Law, including matters arising out of, based on or related to (i) the presence or Release of, or exposure to, any Hazardous Materials at any location, whether or not owned, operated, leased or managed by the Company, or (ii) circumstances forming the basis of any violation or alleged violation of, or liability or obligation under, any Environmental Law or Environmental Permit; and (b) any and all claims by any Person seeking damages (including natural resource damages and restoration costs, investigation costs, and attorney, expert and consultant costs and expenses), contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence, Release, or exposure to, any Hazardous Material.

"Environmental Laws" means all Laws relating in any way to pollution or protection of the environment (including ambient air, surface water, groundwater, soils or subsurface strata), the preservation or reclamation of natural resources, the protection of human health as it relates to exposure to Hazardous Materials or the use, generation, management, handling, transport, treatment, disposal, storage or Release of Hazardous Materials.

"Environmental Permits" means all Permits arising under or relating to Environmental Laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business that is, or at any relevant time was, together with the Company, treated as a "single employer" under Section 414(b), 414(c) or 414 (m) of the Code.

"Estimated Closing Purchase Price" has the meaning ascribed thereto in Section 2.2(a).

"Final Purchase Price" has the meaning ascribed thereto in Section 2.3(b).

"Financial Statements" has the meaning ascribed thereto in Section 5.7(a).

"Fundamental Representations" has the meaning ascribed thereto in Section 10.1.

"Funded Indebtedness" means with respect to any Person: (a) all indebtedness for borrowed money; (b) Liabilities evidenced by bonds, debentures, notes or debt securities; (c) Liabilities under or in connection with letters of credit or bankers' acceptances or similar items; (d) in respect of any of the foregoing obligations, any principal, accrued and unpaid interest on and any prepayment or other premiums, penalties, fees, expenses, indemnities, reimbursements or similar contractual amounts or charges; and (e) without duplication, all guarantees with respect to Liabilities of a type described in any of clauses (a) through (d) above.

4

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time.

"Geographic Area" has the meaning ascribed thereto in Section 9.7(a).

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs, in each case, as amended.  For example, the "Governing Documents" of a corporation are its articles or certificate of incorporation and by-laws, and the "Governing Documents" of a limited liability company are its articles or certificate of organization and its operating agreement or limited liability company agreement.

"Governmental Authority" means any federal, state or local government, court of competent jurisdiction, administrative agency or commission or other governmental or regulatory authority or instrumentality of the United States or any other country or any other state, county, municipality or other governmental division of any country acting for purposes of the definitions of Laws and Taxes and Sections 4.4, 5.4, 5.13, 5.15, 5.18, 5.19, 6.4 and 7.3 in a regulatory, administrative, judicial or similar capacity but expressly excluding any such governmental entity in its capacity as a customer or purchaser of the products or services of the Company.

"Harrison Employment Agreement" means the Employment Agreement dated as of the Closing Date by and between the Company and Harrison in the form attached hereto as Exhibit A.

"Hazardous Materials" means any chemical, material, substance, waste, pollutant or contaminant (a) that is or contains radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum byproducts and derivatives, or radon gas or (b) that is prohibited, limited or regulated by or pursuant to any Environmental Law or that is regulated, defined, listed or identified under any Environmental Law as a "hazardous waste," "hazardous substance," "toxic substance" or words of similar import thereunder.

"Indebtedness" means with respect to any Person: (a) Funded Indebtedness, (b) Liabilities to pay the deferred purchase price of property or services other than those trade payables incurred in the ordinary course of business, (c) all Liabilities under conditional sale or other title retention agreements, (d) all Liabilities with respect to vendor advances or any other advances made to such Person, (e) all Liabilities arising out of interest rate and currency swap arrangements and any other arrangements designed to provide protection against fluctuations in interest or currency rates and (f) all Liabilities arising from any breach of any of the foregoing.

"Indemnified Amounts" has the meaning ascribed thereto in Section 10.5.

"Indemnified Party" has the meaning ascribed thereto in Section 10.1.

"Indemnifying Party" has the meaning ascribed thereto in Section 10.1.

5

"Intellectual Property" means any and all rights in intellectual property or other proprietary rights, existing now or in the future in the United States or anywhere in the universe. Intellectual Property includes, without limitation, any and all rights in, to, or subsisting in the following:

(a)     all patents and all applications, renewals and extensions therefor;

(b)     all copyrights, copyrightable works and mask work rights and all applications for registration, registrations, renewals and extensions of registrations thereof;

(c)     all trademarks, service marks, logos, trade names and domain names, together with the goodwill of the business associated therewith, all applications for registration and registrations thereof, renewals thereof, the right to bring opposition and cancellation proceedings;

(d)     all proprietary information and materials, whether or not patentable or copyrightable, and whether or not reduced to practice, including, without limitation, all technology, ideas, research and development, inventions, designs, manufacturing and operating specifications and processes, know-how, formulae, customer and supplier lists, shop rights, drawings, patterns, trade secrets, confidential information, technical data, databases, data compilations and collections, computer programs and processes; and

(e)     all claims, causes of action and rights to sue for past, present and future infringement or unconsented use of any of the foregoing intellectual and other proprietary rights and all rights arising therefrom and pertaining thereto and all damages, proceeds and revenues arising from or relating to any and all of the foregoing.

"Inventory" has the meaning ascribed thereto in Section 5.7(e).

"IRS" means the Internal Revenue Service.

"Key Employees" means Sellers and Karen Gillner.

"Laws" means all laws, statutes, ordinances, rules, rules of common law, regulations, directives, decisions, judgments, rulings, Orders, decrees, injunctions or other binding directives of any Governmental Authority.

"Lease" has the meaning ascribed thereto in Section 5.10(a).

"Lease Agreement" means the lease by and between the Company and JHJ Partnership in the form attached hereto as Exhibit B.

"Leased Real Property" has the meaning ascribed thereto in Section 5.10(a).

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

6

"Lien" means any mortgage, pledge, encumbrance, lien, charge, claim, equitable interest, option, pledge, right of first refusal, or security interest of any kind, including, without limitation, any restriction on voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Loss" means all damages, awards, losses, Liabilities (including Tax Liabilities), obligations, claims, payments, fines, penalties, interest, costs and expenses (including reasonable attorneys' fees, court costs and other reasonable professional fees and expenses and any amounts paid in settlement), including without limitation any diminution in value of the Company or its business or assets.

"Material Adverse Effect" means any change, event, occurrence, effect, development or circumstance that, individually or in the aggregate with all other changes, events, occurrences, effects, developments or circumstances, is or would reasonably be expected to be materially adverse to the Business, assets, Liabilities, condition (financial or other), operations, or results of operations of the Company.

"Material Contracts" has the meaning ascribed thereto in Section 5.8(a).

"Measurement Period" has the meaning ascribed thereto in Section 2.4(a).

"Minimum EBITDA Target" means the minimum EBITDA target specified in Section 2.4.

"Minimum Net Sales Target" means the minimum Net Sales target specified in Section 2.4.

"Nagel Employment Agreement" means the Employment Agreement dated as of the Closing Date by and between the Company and Nagel in the form attached hereto as Exhibit C.

"Net Income" shall mean, for any Measurement Period of determination, net earnings (or net loss) of the Company for such period, but excluding (without duplication) (a) any gains or losses from the collection of the proceeds of any insurance policies or settlements, (b) any restoration to income of any reserve, (c) any income or gain or loss during such period from any prior period adjustments resulting from any change in accounting principles in accordance with GAAP, or any discontinued operations or disposition thereof, and (d) any gains resulting from the retirement or extinguishment of Indebtedness or the disposition of any securities. Net Income shall exclude any income arising from the Company's sale or license of (i) any products or services of Purchaser or Purchaser's Affiliates (other than the Company) and (ii) any products or services derived from any acquisition, joint venture (other than a subcontractor or similar arrangement in the ordinary course of business to provide products or services to a customer on a joint basis with others) or similar transaction involving the Company. Income made in currencies other than United States Dollars will be converted into United States Dollars based on the applicable exchange rates used for purposes of such income in Purchaser's audited year-end consolidated financial statements.

"Net Sales" means the gross sales of the Company for the applicable period measured net of returns, customer allowances and rebates, collection losses and customer discounts. Net Sales

7

shall exclude any sales arising from the Company's sale or license of (i) any products or services of Purchaser or Purchaser's Affiliates (other than the Company) and (ii) any products or services derived from any acquisition, joint venture (other than a subcontractor or similar arrangement in the ordinary course of business to provide products or services to a customer on a joint basis with others) or similar transaction involving the Company.  Sales made in currencies other than United States Dollars will be converted into United States Dollars based on the applicable exchange rates used for purposes of such sales in Purchaser's audited year-end consolidated financial statements.

"Net Sales Target" means the Net Sales target specified in Section 2.4.

"Order" means any judgment, award, decision, order, decree, writ, injunction, assessment or ruling entered or issued by any Governmental Authority.

"Party" means each of Sellers and Purchaser.

"Permit" means permits, licenses, approvals, certificates and other registrations, authorizations and exemptions of and from all applicable Governmental Authorities.

"Performance Bonds" means (i) Performance Bond No. 6102371529 issued by the Company and its surety in favor of the Metro-North Commuter Railroad Company in the amount of $2,678,640, (ii) Performance Bond No. 6102371511 issued by the Company and its surety in favor of the Metro-North Commuter Railroad Company in the amount of $564,586, and (iii) Labor and Material Payment Bond No. ASA1646-3828 issued by the Company and its surety in favor of the Niagara Frontier Transportation Authority in the amount of $2,886,076.43.

"Permitted Liens" means mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings or Liens for Taxes and other governmental charges that are not due and payable or that may thereafter be paid without interest or other penalty, in each case, (a) for which adequate accruals or reserves have been established on the Balance Sheet in accordance with GAAP or (b) which have been incurred after the date of the Balance Sheet in the ordinary course of business, which are not material and which do not constitute or secure Indebtedness.

"Permitted Transferee" has the meaning ascribed thereto in Section 12.1.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust, joint venture, association or other organization, whether or not a legal entity or a Governmental Authority.

"Plan" means (a) each employment, consulting, noncompetition, nondisclosure, nonsolicitation, severance, termination, pension, retirement, supplemental retirement, excess benefit, profit sharing, bonus, incentive, deferred compensation, retention, transaction and change in control plan, program, arrangement, agreement, policy or commitment, (b) each stock option, restricted stock, deferred stock, performance stock, stock appreciation, stock unit or other equity or equity-based plan, program, arrangement, agreement, policy or commitment, and (c) each savings, life, health, disability, accident, medical, dental, vision, cafeteria, insurance, flex

8

spending, adoption/dependent/employee assistance, tuition, vacation, paid-time-off, other welfare fringe benefit and other employee compensation plan, program, arrangement, agreement, policy or commitment, including in each case, each "employee benefit plan" as defined in Section 3(3) of ERISA and any trust, escrow, funding, insurance or other agreement related to any of the foregoing.

"Pre-Closing Tax Period" means any Tax periods ending on or prior to the Closing Date and that portion of any Straddle Period ending on (and including) the Closing Date.

"Post-Closing Adjustment Statement" has the meaning ascribed thereto in Section 2.3(a).

"Proceeding" has the meaning ascribed thereto in Section 5.13.

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Proposed Final Purchase Price" has the meaning ascribed thereto in Section 2.3(a).

"Purchase Price" means (a) Seventeen Million and No/100 Dollars ($17,000,000), (b) plus the Working Capital Adjustment Excess or less the Working Capital Adjustment Deficiency, (c) less the Additional Purchase Price Adjustment.

"Purchase Price Dispute Notice" has the meaning ascribed thereto in Section 2.3(a).

"Purchaser" has the meaning ascribed thereto in the Preamble.

"Purchaser Indemnified Party" has the meaning ascribed thereto in Section 10.2(a).

"Release" means any release, spill, emission, emanation, emptying, escaping, leaking, injection, deposit, disposal, discharge, dispersal, leaching, placing, pumping, pouring, seeping or migration into, on, in, under, from or through the environment (including ambient air, surface water, ground water, soils, land surface, subsurface strata) or within any building, structure, facility or fixture.

"Release of Claims" means the Release of Claims and Assignment dated as of the Closing Date by and among each Seller and his spouse and the Company in the form attached hereto as Exhibit D, which releases all claims Sellers may have against the Company and assigns all rights Sellers may have in any Intellectual Property to the Company.

"Remedies Exception" means: (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other Laws of general application, heretofore or hereafter enacted or in effect, affecting the rights and remedies of creditors generally; and (b) general principles of equity, including good faith and fair dealing, regardless of whether in a proceeding at equity or at Law.

"Section 338(h)(10) Election" has the meaning ascribed thereto in Section 9.3(f)(i).

9

"Section 338(h)(10) Election Forms" has the meaning ascribed thereto in Section 9.3(f)(i).

"Seller Indemnified Party" has the meaning ascribed thereto in Section 10.3.

"Sellers" has the meaning ascribed thereto in the Preamble.

"Sellers' Knowledge" means the knowledge of any Key Employee or any Seller, in each case, after reasonable inquiry consistent with such individual's duties.

"Sellers' Representative" has the meaning ascribed thereto in Section 12.15.

"Shareholders Agreement" means the Stock Restriction Agreement to which Nagel and Harrison are a party dated March 28, 1991, as amended May 8, 2000.

"Shares" has the meaning ascribed thereto in the Recitals.

"Straddle Period" means any Tax period beginning on or prior to and ending after the Closing Date.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, estimated, branch profits, chargeable gains, corporation, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, ad valorem, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, windfall profits, premium, escheat, environmental, customs duties, real property, personal property, capital stock, employment, social security (or similar), unemployment, disability, payroll, national insurance contribution, license, employee or other withholding, or other tax imposed by any Governmental Authority, of any kind whatsoever, including deductions or withholdings for or on account of such amounts and any interest, penalties or additions to tax imposed with respect to such amounts, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person by Law, by Contract, or otherwise.

"Tax Authority" shall mean any Governmental Authority, having or purporting to exercise jurisdiction with respect to any Tax.

"Tax Proceeding" has the meaning ascribed thereto in Section 9.3(d)(ii).

"Tax Representations" has the meaning ascribed thereto in Section 10.1.

"Tax Return" means any return, report, declaration, claim for refund, information return or other document relating to Taxes, including any related or supporting schedule, statement or information thereto, and including any amendment thereof.

"Third Party Claim" has the meaning ascribed thereto in Section 10.4(d).

"Threshold" has the meaning ascribed thereto in Section 10.4(b).

10

"Transaction Documents" means the Release of Claims, the Nagel Employment Agreement, the Harrison Employment Agreement and the Lease Agreement.

"Transfer Taxes" has the meaning ascribed thereto in Section 9.2.

"Unaudited Closing Balance Sheets" has the meaning ascribed thereto in Section 2.3(a).

"WARN Act" has the meaning ascribed thereto in Section 5.18(d).

"Working Capital" means (a) the cash, contracts receivable (net), inventories, deposits and costs and estimated earnings in excess of billings on uncompleted contracts less (b) accounts payable, accrued payroll, withheld and accrued payroll taxes, accrued capital stock tax, accrued profit sharing contribution and billings in excess of costs and estimated earnings on uncompleted contracts, all calculated consistently with the Balance Sheet (as hereinafter defined) and the Company's financial statements prior to the Closing Date, and also in accordance with GAAP, applied on a basis consistent with the Balance Sheet (provided that in the event of a conflict between GAAP and the Balance Sheet, GAAP shall control).

"Working Capital Adjustment Deficiency" means the amount by which Working Capital is less than the Working Capital Target.

"Working Capital Adjustment Excess" means the amount by which Working Capital is greater than the Working Capital Target.

"Working Capital Average" means the average Working Capital of the Company as of each of July 31, 2012, August 31, 2012 and September 30, 2012

"Working Capital Target" means (i) $6,800,000 for purposes of determining the estimated Working Capital Adjustment Excess or estimated Working Capital Adjustment Deficiency pursuant to Section 2.2(c), and (ii) the Working Capital Average for all other purposes. The Working Capital Target shall be calculated with the assumption that the Company has $300,000 in cash regardless of the actual amount of cash that the Company has.

## ARTICLE 2

## PURCHASE AND SALE

Section 2.1   Purchase and Sale of the Shares.   Upon the terms and subject to the conditions of this Agreement, at the Closing, each Seller agrees to sell, convey, assign and transfer to Purchaser, and Purchaser agrees to purchase from such Seller, all of such Seller's Shares, free and clear of all Liens.   In return for the Shares, Purchaser shall pay to Sellers an amount equal to the Final Purchase Price plus the Contingent Consideration, if any, in each case as determined below.   All payments to Sellers under this Agreement shall be allocated fifty percent (50%) to Nagel and fifty percent (50%) to Harrison.   Unless otherwise specified in this Agreement, all obligations of Sellers under this Agreement are joint and several obligations of Sellers.

11

Section 2.2    Estimated Closing Purchase Price.

(a)    Estimated Closing Purchase Price.    As consideration for the sale, conveyance, assignment and transfer of the Shares to Purchaser pursuant to Section 2.1, the initial aggregate consideration to be paid by Purchaser (the "Estimated Closing Purchase Price") will be determined as follows:

(i)    Seventeen Million and No/100 Dollars ($17,000,000);

(ii)    plus fifty percent (50%) of the estimated Working Capital Adjustment Excess or minus the estimated Working Capital Adjustment Deficiency; and

(iii)    less the estimated Additional Purchase Price Adjustment.

(b)    Payment of the Estimated Closing Purchase Price.    On the Closing Date, Purchaser shall pay the Estimated Closing Purchase Price to the accounts previously designated by Sellers by bank wire transfer of immediately available funds; provided, however that any estimated Working Capital Excess shall be paid as provided in Section 2.2(c).

(c)    Closing and Post-Closing Estimates.

(i)    At least three (3) Business Days prior to the Closing, Sellers shall provide Purchaser with (A) invoices for all unpaid Company Expenses, and (B) evidence reasonably satisfactory to Purchaser indicating the amount necessary to pay off all Indebtedness of the Company at Closing.  Based on the foregoing, Purchaser shall determine the estimated Additional Purchase Price Adjustment.  At Closing, Purchaser shall pay (i) the Company Expenses to the extent reflected in the estimated Additional Purchase Price Adjustment and (ii) Indebtedness other than Performance Bonds, if any.

(ii)    Within three (3) Business Days after the Closing, Sellers shall deliver to Purchaser an estimate of the Working Capital as of the Closing Date; provided that if Purchaser reasonably disagrees with such estimate then Purchaser shall make its own estimate which shall be used for purposes of determining the estimated Working Capital Adjustment Excess or the estimated Working Capital Adjustment Deficiency, as applicable.  Within two (2) Business Days after such determination, Purchaser shall pay to Sellers fifty percent (50%) of the estimated Working Capital Adjustment Excess, if any, or Sellers shall pay to Purchasers the estimated Working Capital Adjustment Deficiency, if any.

Section 2.3    Post-Closing Audit; Dispute Resolution.

(a)    Purchaser or, upon the instruction of Purchaser, the Company, shall prepare an unaudited balance sheet of the Company as of each of the Closing Date, July 31, 2012, August 31, 2012 and September 30, 2012 (the "Unaudited Closing Balance Sheets") and an unaudited statement (the "Post-Closing Adjustment Statement") setting forth a calculation of (i) the Working Capital Target, (ii) the Working Capital Adjustment Deficiency or Working Capital Adjustment Excess as of the Closing Date, (iii) the Additional Purchase Price Adjustment as of the Closing Date and (iv) the resulting proposed calculation of the Purchase Price (the "Proposed Final Purchase Price").  The Post-Closing Adjustment Statement shall

12

outline in reasonable detail Purchaser's calculation of the Proposed Final Purchase Price. On or before December 31, 2012, Purchaser or the Company shall deliver such Unaudited Closing Balance Sheets and Post-Closing Adjustment Statement to Sellers. The Unaudited Closing Balance Sheets and the line items set forth on the Post-Closing Adjustment Statement shall be prepared in accordance with GAAP, applied on a basis consistent with the Balance Sheet (provided that in the event of a conflict between GAAP and consistency with the Balance Sheet, GAAP shall control). Sellers shall provide reasonably requested assistance to Purchaser and the Company in the preparation of the Unaudited Closing Balance Sheets and Post-Closing Adjustment Statement. Purchaser shall provide, or shall cause the Company to provide, to Sellers and their accountants, attorneys and agents reasonable access during normal business hours to the books and records of the Company for the sole purpose of verifying the Unaudited Closing Balance Sheets and the Post-Closing Adjustment Statement. If Working Capital for any month included in the calculation of the Working Capital Average is significantly increased or decreased as a result of a non-recurring event outside the ordinary course of business, then the parties will reasonably discuss and negotiate an adjustment (positive or negative) to the Working Capital Average.

        (b)      If Sellers disagree with the Proposed Final Purchase Price, then within thirty (30) days after Sellers' receipt of the Post Closing Adjustment Statement, Sellers must prepare and provide to Purchaser a statement reflecting Sellers' calculation of (i) the Working Capital Target, (ii) the Working Capital Adjustment Deficiency or Working Capital Adjustment Excess, (iii) the Additional Purchase Price Adjustment and (iv) the resulting proposed calculation of the Purchase Price (a "Purchase Price Dispute Notice"). The Purchase Price Dispute Notice shall only reflect proposed changes to the Proposed Final Purchase Price that either (i) are mathematically inaccurate or (ii) were not prepared in accordance with the standards set forth in Section 2.3(a) and no other grounds for dispute are permitted. The Purchase Price Dispute Notice shall outline in reasonable detail Sellers' calculation of the Purchase Price. In the event that Sellers do not provide a Purchase Price Dispute Notice within such thirty (30)-day period, then the Proposed Final Purchase Price shall be final and binding on Sellers. If a Purchase Price Dispute Notice is delivered by Sellers within such thirty (30)-day period, then Purchaser and Sellers' Representative shall use reasonable efforts to resolve the calculation of the Purchase Price. If the calculation of the Purchase Price remains unresolved after thirty (30) days from Purchaser's receipt of the Purchase Price Dispute Notice, Purchaser and Sellers shall jointly retain the Pittsburgh, Pennsylvania office of a national accounting firm (or such firm's applicable Affiliates) that does not currently provide services to Sellers or Purchaser (the "Accounting Firm") to calculate the Purchase Price. If Purchaser and Sellers fail to agree on an Accounting Firm within five (5) Business Days after the expiration of the thirty (30)-day period following Purchaser's receipt of the Purchase Price Dispute Notice, each of Purchaser and Sellers may exclude from the following list one accounting firm on an alternating basis, with Sellers choosing first, and the last remaining accounting firm shall be the Accounting Firm: Deloitte & Touche; Ernst & Young; KPMG; and Pricewaterhouse Coopers. Purchaser and Sellers shall request that the Accounting Firm render a determination within thirty (30) days of its retention, and the Parties shall cooperate fully with the Accounting Firm so as to enable it to make such determination as quickly and as accurately as practicable. The Accounting Firm's determination as to the calculation of the Purchase Price shall be in writing, shall conform with this Section 2.3 (provided, however, that the Accounting Firm's determination of the Purchase Price shall not be lower than Purchaser's calculation of the Purchase Price, nor greater than

13

Sellers' calculation of the Purchase Price) and shall be conclusive and binding upon the parties hereto. The costs and expenses of the Accounting Firm shall be allocated among Purchaser and Sellers in proportion to the amount by which such Party's calculation of the Purchase Price differs from the determination of the Accounting Firm. The "Final Purchase Price" means either (i) in the event that Sellers do not provide a Purchase Price Dispute Notice, the Proposed Final Purchase Price as set forth on the Post-Closing Adjustment Statement prepared by Purchaser or the Company under Section 2.3(a); (ii) in the event Sellers provide a Purchase Price Dispute Notice but the parties are able to reach agreement on the Purchase Price, the Purchase Price agreed to in writing among Sellers and Purchaser; or (iii) in the event that the Accounting Firm is engaged to calculate the Purchase Price in accordance with this Section 2.3(b), the Purchase Price as determined by the Accounting Firm.

(c)     If the Final Purchase Price is greater than the Estimated Closing Purchase Price, Purchaser shall pay the difference to Sellers on or prior to the fifth (5th) Business Day following the final determination of the Purchase Price under Section 2.3(b).

(d)     If the Final Purchase Price is less than the Estimated Closing Purchase Price, Sellers shall pay the difference to Purchaser on or prior to the fifth (5th) Business Day following the final determination of the Final Purchase Price under Section 2.3(b).

Section 2.4     Contingent Consideration.

(a)     Contingent Consideration.  In addition to the Final Purchase Price, as consideration for the sale, conveyance, assignment and transfer of the Shares to Purchaser pursuant to Section 2.1, Purchaser shall pay the contingent consideration (the "Contingent Consideration"), if any, determined in accordance with this Section 2.4.  If the following conditions are satisfied for the relevant measurement periods specified in the tables below (each a "Measurement Period"), then Sellers will receive the "Contingent Consideration Payment" (as set forth in the tables and paragraphs below) for the relevant Measurement Period:

(i)     both Harrison and Nagel are employed by Purchaser, the Company or an Affiliate thereof on the last day of the relevant Measurement Period (which in the case of Harrison shall be the first or second Measurement Period only), or have been terminated as a result of the death, Disability, Good Reason or for other than Cause (each as defined in the Nagel Employment Agreement or Harrison Employment Agreement, as applicable) (the "Employment Condition"); and

(ii)     either

(A)     Net Sales are equal to or greater than the Minimum Net Sales Target set forth below for the relevant Measurement Period; or

(B)     EBITDA is equal to or greater than the Minimum EBITDA Target set forth below for the relevant Measurement Period.

14

|  | Measurement Periods | | | |
|---|---|---|---|---|
|  | April 1, 2012 to March 31, 2013 | April 1, 2013 to March 31, 2014 | April 1, 2014 to March 31, 2015 | Contingent Consideration Payment |
| Minimum Net Sales Target | $ 12 million | $ 15.2 million | $ 18 million | $ 400,000 |
| Net Sales Target | $ 15 million | $ 19 million | $ 22.5 million | $ 1 million |
| Minimum EBITDA Target | $ 2.8 million | $ 3.6 million | $ 3.84 million | $ 400,000 |
| EBITDA Target | $ 3.5 million | $ 4.5 million | $ 4.8 million | $ 1 million |

The Contingent Consideration Payments will be earned in accordance with the schedule below with each of the Net Sales Target and the EBITDA Target being measured separately for each Measurement Period; provided, however, that Sellers will not be entitled to any Contingent Consideration Payment unless either (i) Net Sales exceed the Minimum Net Sales Target or (ii) EBITDA exceeds the Minimum EBITDA Target.

| Percentage of Net Sales or EBITDA Target Achieved | Percentage of Contingent Consideration Payment Earned |
|---|---|
| <80% | 0% |
| 80% up to 85% | 40% |
| 85% up to 90% | 60% |
| 90% up to 95% | 80% |
| 95% up to 100% | 90% |
| 100% or more | 100% |

In addition, if both (i) Net Sales equal or exceed the Net Sales Target and (ii) EBITDA equals or exceeds the EBITDA Target for the relevant Measurement Period, then Sellers will receive an additional Contingent Consideration Payment equal to 15% of the amount by which Net Sales for the relevant Measurement Period exceed the applicable Net Sales Target with a maximum additional Contingent Consideration Payment of $1 million with respect to any Measurement Period. If the Employment Condition is satisfied and either or both Net Sales or EBITDA equal or exceed the Minimum Net Sales Target or Minimum EBITDA Target, as applicable for the relevant Measurement Period, then Sellers will receive the applicable Contingent Consideration Payment(s) set forth above for the relevant Measurement Period. If both Net Sales and EBITDA are less than the Minimum Net Sales Target and Minimum EBITDA Target, as applicable for the relevant Measurement Period, then Sellers shall not be entitled to any Contingent Consideration Payment for the relevant Measurement Period.

15

If with respect to any Measurement Period both (i) the Employment Condition is satisfied and (ii) Harrison and/or Nagel has been previously terminated other than for Cause or resigned for Good Reason, then each of the Net Sales Target and the EBITDA Target for such Measurement Period shall be reduced to ninety percent (90%) of the amount specified above, and the Contingent Consideration Payment for each such Measurement Period shall be a minimum of One Million and No/100 Dollars ($1,000,000) in the aggregate; provided, however, that termination of Harrison without Cause or Harrison's resignation for Good Reason following the two (2)-year anniversary of the Closing Date shall not trigger a reduction in the Net Sales Target or the EBITDA Target for the third Measurement Period.

      (b)   Preparation of Calculations. Within ninety (90) days following the end of each Measurement Period, Purchaser shall prepare and deliver to Sellers a statement of (i) Net Sales and (ii) EBITDA, in each case for such Measurement Period prepared in accordance with GAAP ("Contingent Consideration Payment Statement"). The Contingent Consideration Payment Statement shall outline in reasonable detail Purchaser's calculation of Net Sales and EBITDA and the resulting Contingent Consideration Payment. Notwithstanding the foregoing, if the Employment Condition is not satisfied as of the last day of any Measurement Period, and therefore the Sellers are not entitled to any Contingent Consideration Payment for such Measurement Period, or if the Contingent Consideration Payment is the maximum amount provided for above, then Purchaser shall not be required to deliver a Contingent Consideration Payment Statement.

      (c)   Dispute Mechanic. The calculation of the Net Sales and EBITDA as delivered to Sellers shall be final and binding on the parties hereto unless, within thirty (30) days after delivery to Sellers, Sellers shall deliver to Purchaser a written notice (a "Dispute Notice") to the effect that calculations contained in the Contingent Consideration Payment Statement either (i) are mathematically inaccurate or (ii) were not prepared in accordance with the standards set forth in Section 2.4(b) and no other grounds for dispute are permitted. The Dispute Notice shall outline in reasonable detail Sellers' calculation of Net Sales and EBITDA and must demonstrate that both (i) Net Sales exceed the Minimum Net Sales Target and (ii) EBITDA exceeds the Minimum EBITDA Target, in each case as set forth above for the applicable Measurement Period. If a Dispute Notice is delivered by Sellers within such thirty (30)-day period, then Purchaser and Sellers shall use reasonable efforts to resolve the calculation of Net Sales and EBITDA. If the calculation of Net Sales and EBITDA remains unresolved after thirty (30) days from Purchaser's receipt of the Dispute Notice, Purchaser and Sellers shall jointly retain an Accounting Firm to calculate Net Sales and EBITDA. The Accounting Firm shall be selected in the manner provided under Section 2.3. Purchaser and Sellers shall request that the Accounting Firm render a determination within thirty (30) days of its retention, and the parties hereto shall cooperate fully with the Accounting Firm so as to enable it to make such determination as quickly and as accurately as practicable. The Accounting Firm's determination as to the calculation of Net Sales and EBITDA shall be in writing, shall conform with this Section 2.4 and shall be conclusive and binding upon the parties hereto. The costs and expenses of the Accounting Firm shall be paid equally by Sellers and Purchaser. The terms of this Section 2.4(c) contain the exclusive rights and remedies of the Parties for resolving any disputes related to the amount of the Contingent Consideration Payments.

16

(d)   <u>Payment of Contingent Consideration</u>.   Payment of Contingent Consideration, if any, shall be made within five (5) Business Days after (i) the Parties resolve the determination of Net Sales and EBITDA for the relevant Measurement Period, including any resolution achieved by Sellers' delivery to Purchaser of written notice of Sellers' agreement with the Contingent Consideration Payment Statement, or (ii) the Accounting Firm finally determines Net Sales and EBITDA for the relevant Measurement Period.

(e)   <u>Protective Covenant</u>.   Notwithstanding anything herein to the contrary, Sellers shall not be entitled to any Contingent Consideration Payment if any Seller breaches any of the covenants set forth in <u>Section 9.5</u>, <u>Section 9.6</u> or <u>Section 9.7</u>.

(f)   <u>Sellers' Acknowledgement</u>.   Sellers understand and acknowledge that control of all business decisions of the Company (including, without limitation, sales and marketing, capital expenditures, product pricing, employee hiring and retention, subcontracting authority, facilities management and acquisitions or dispositions of assets (and the timing thereof)) from and after the Closing Date shall be the ultimate right of the board of directors of Purchaser, and that Purchaser may operate its business and the business of its subsidiaries (including the Company) in the manner it deems appropriate in its sole discretion.   Nothing in this paragraph shall limit each Seller's rights and obligations under the Harrison Employment Agreement or the Nagel Employment Agreement, as applicable.

## ARTICLE 3

## CLOSING

Subject to satisfaction of the conditions precedent set forth in <u>Article 8</u>, the closing of the transactions contemplated hereby (the "<u>Closing</u>") shall take place at the Chicago offices of McDermott Will & Emery LLP on the Closing Date.

Section 3.1   <u>Delivery and Actions by Sellers at Closing</u>.   At or prior to the Closing, Sellers shall deliver, or shall cause to be delivered, to Purchaser:

(a)   stock certificates representing all of the Shares;

(b)   instruments of transfer of the Shares, validly executed by Sellers evidencing the transfer of the Shares to Purchaser;

(c)   a certificate of each Seller dated as of the Closing Date, in accordance with Treasury Regulation Section 1.1445-2(b), certifying that such Seller is not a foreign Person;

(d)   written resignations or notices of removal for each director of the Company in their capacity as such;

(e)   an executed signature page of Sellers, their applicable Affiliates or the Company, as the case may be, of each Transaction Document to which such Sellers, Affiliates or the Company, as the case may be, is a party;

17

(f)      original IRS Form 8023 (Elections Under Section 338 for Corporations Making Qualified Stock Purchases) signed by the Sellers; and

(g)      evidence of termination of the Contracts required to be terminated pursuant to Section 7.6 in form satisfactory to Purchaser;

(h)      payoff letters or other documentation for Indebtedness, if any; and

(i)      evidence reasonably satisfactory to the Purchaser that the Company has at least $300,000 in unrestricted cash on hand.

Section 3.2    Delivery and Actions by Purchaser at Closing.  At or prior to the Closing, Purchaser shall deliver to Sellers:

(a)      an executed signature page of Purchaser of each Transaction Document to which Purchaser is a party; and

(b)      the Estimated Closing Purchase Price by bank wire transfer of immediately available funds to the accounts previously designated by Sellers; provided that any estimated Working Capital Adjustment Excess shall be paid as provided in Section 2.2(c).

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLERS REGARDING SELLERS

Each Seller hereby severally represents and warrants to Purchaser with respect to itself as follows:

Section 4.1    Authority.  Such Seller has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Each of this Agreement and the Transaction Documents to which such Seller is a party has been duly executed and delivered by such Seller and, assuming the due authorization, execution and delivery by the other parties hereto or thereto, constitutes a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to the Remedies Exception.

Section 4.2    Title to Shares.  Such Seller is the record and beneficial owner of the Shares set forth opposite such Seller's name on Section 5.5(a) of the Company Disclosure Schedule, free and clear of all Liens or any other restrictions on transfer.  At the Closing, such Seller shall transfer to Purchaser good title to the Shares owned by such Seller, free and clear of all Liens, adverse claims or any other restrictions on transfer.

Section 4.3    Non-contravention.  Neither the execution or delivery of this Agreement nor any Transaction Document by such Seller, nor the consummation by such Seller of the transactions contemplated hereby and thereby will: (a) contravene, conflict with or constitute a violation of (whether after the giving of notice, lapse of time or both) in any material respect, or require any Consent under, any Contract to which such Seller is a party; or (b) contravene,

18

conflict with or constitute a violation of (whether after the giving of notice, lapse of time or both) any Law or Order to which such Seller is subject.

Section 4.4    Consents.    No material Consent, notification or filing of, with or to any Governmental Authority is required to be obtained or made by such Seller in connection with the execution and delivery of this Agreement or any Transaction Document or in connection with the consummation of the transactions contemplated hereby and thereby.

Section 4.5    Litigation.    There are no Proceedings pending or, to such Seller's knowledge, threatened against or affecting such Seller, which could reasonably adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement or any Transaction Document to which such Seller is a party.

Section 4.6    Brokers.    No Person is or will be entitled to a broker's, finder's, investment banker's, financial advisor's or similar fee from such Seller in connection with this Agreement or any of the transactions contemplated hereby.

· ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF SELLERS REGARDING THE COMPANY

Subject to the qualifications set forth in the applicable sections or subsections of the Company Disclosure Schedule (it being understood and agreed that only the representation or warranty specifically referenced in the Company Disclosure Schedule by section or subsection of this Article 5 shall be qualified by the referenced disclosure), Sellers hereby, jointly and severally, represent and warrant to Purchaser, as follows:

Section 5.1    Organization and Good Standing.    The Company is a corporation, duly organized, validly existing and in good standing under the Laws of Pennsylvania and has the requisite corporate power and authority to carry on its business as presently conducted and to own, lease and operate its properties.  The Company is duly qualified to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification and good standing necessary. The Company has made available to Purchaser correct and complete copies of the Company's Governing Documents.  The Company is not in default under or in violation of any provision of its Governing Documents.

Section 5.2    Authority.    The Company has the requisite power and authority to execute and deliver the Transaction Documents to which it is a party, to perform its obligations thereunder and to consummate the transactions contemplated thereby.  The execution, delivery and performance by the Company of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of the Company.  Each of the Transaction Documents to which the Company is a party has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery by the other parties thereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to the Remedies Exception.

19

Section 5.3    No Conflicts.  Neither the execution or delivery of this Agreement or any Transaction Document by Sellers or Company, nor the consummation by Sellers  and the Company of the transactions contemplated hereby and thereby will: (a) conflict with, contravene or constitute a violation of (whether after the giving of notice, lapse of time or both) the Governing Documents of the Company; (b) contravene, conflict with or constitute a violation of (whether after the giving of notice, lapse of time or both) in any material respect, or require any Consent under, any Material Contract; or (c)  conflict with or constitute a violation of (whether after the giving of notice, lapse of time or both) any Law or Order to which the Company is subject.

Section 5.4    Consents.    No Consent, notification or filing of, with or to any Governmental Authority is required to be obtained or made by the Company in connection with the execution and delivery of this Agreement or any Transaction Document by Sellers or the Company or in connection with the consummation of the transactions contemplated hereby and thereby.

Section 5.5    Capitalization.

(a)    Section 5.5(a) of the Company Disclosure Schedule accurately sets forth (i) the number of authorized shares of each class of capital stock of the Company, (ii) the number of issued and outstanding shares of each class of capital stock of the Company, and (iii) the number of shares of each class of capital stock owned by each Seller.

(b)    All of the Shares have been duly authorized and validly issued, and are fully paid and non-assessable.  Immediately after the Closing, Purchaser shall own all of the outstanding shares of capital stock of the Company, free and clear of any Liens, adverse claims or any other restrictions on transfer.  There are no outstanding (i) shares of capital stock of the Company other than the Shares; (ii) securities of the Company convertible into or exchangeable for shares of capital stock of the Company or containing any profit participation features; or (iii) options, warrants, calls, subscriptions or other rights to acquire from the Company or other obligations of the Company to issue, any capital stock or securities convertible into or exchangeable for capital stock of the Company.  There are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire or retire for value any securities of the Company.  There are no statutory or contractual equityholder preemptive or similar rights, rights of first refusal or registration rights with respect to the securities of the Company.  There are no agreements with respect to the voting or transfer of the securities of the Company except as set forth on Section 5.5(b) of the Company Disclosure Schedule.  The Company has not violated any applicable federal or state securities Laws or any preemptive or similar rights created by statute, organizational document or agreement in connection with the offer, sale or issuance of any of the securities of the Company.  There is no liability for, or obligation with respect to, the payment of dividends, distributions or similar participation interests declared or accumulated but unpaid with respect to any shares of capital stock of any class or any other equity interests of the Company, and there are no restrictions of any kind which prevent the payment of the foregoing by the Company.  No current or former shareholder of the Company has any claim or right against the Company that remains unresolved or for which the Company has or may have (now or in the future) any Liability.

20

(c)     Without limiting the generality of any other provision hereof, the Company has not at any time granted or issued, whether pursuant to an equity plan, individual agreement or otherwise, any compensatory stock option, restricted stock, stock appreciation right, stock unit, phantom stock, deferred stock, performance stock or other compensatory equity or equity-linked award.

Section 5.6     No Subsidiaries.  The Company does not have any subsidiaries and does not own any equity interest in any other entity.

Section 5.7     Financial Matters.

(a)     Annexed to Section 5.7(a) of the Company Disclosure Schedule are correct and complete copies of the following financial statements with respect to the Company (collectively, such financial statements, the "Financial Statements"):  (i) the reviewed balance sheets of the Company as of December 31, 2009, 2010 and 2011, and (ii) the related reviewed statements of income, cash flows and shareholders' equity of the Company for the fiscal years ended December 31, 2009, 2010 and 2011.  The reviewed balance sheet of the Company as of December 31, 2011 is referred to as the "Balance Sheet".

(b)     The Financial Statements (i) fairly present, in all material respects, the financial position, results of operations and cash flows of the Company at the respective dates set forth therein and for the respective periods covered thereby and (ii) have been prepared in accordance with GAAP, applied on a consistent basis throughout the dates set forth therein and for the respective periods covered thereby.

(c)     The Company does not have any Liabilities, other than (i) Liabilities reflected on the Balance Sheet, (ii) contractual liabilities or other liabilities incurred in the ordinary course of business which are not material and which were not required by GAAP to be reflected on the Balance Sheet, and (iii) current liabilities which have arisen since December 31, 2011 in the ordinary course of business that are not material and do not relate to Indebtedness or disputes with third parties.

(d)     There is no fraud, suspected fraud or allegation of fraud affecting the Company by management of the Company, employees who have significant roles in the Company's internal controls or other employees of the Company whose fraud could have a material effect on the Financial Statements or the Business.

(e)     All inventory of the Company which is held for sale or resale, including raw materials, work in process and finished goods (collectively, the "Inventory") consists of items of a quantity and quality historically useable and/or saleable in the normal course of business, except for items of obsolete and slow-moving material, all of which have been written down in the Financial Statements to estimated net realizable value in accordance with GAAP. With the exception of items which are obsolete which have been written down to their estimated net realized value in the Financial Statements, the work in process and finished goods Inventory are free from defects in materials and/or workmanship.  To Sellers' Knowledge, the raw materials Inventory received by the Company from third parties is free from defects in materials and/or workmanship.

21

(f)     As of December 31, 2011, the Company did not have and, as of the date of this Agreement, the Company does not have, any outstanding Indebtedness other than the Performance Bonds.

(g)     The books of account and other financial records of the Company, all of which have been made available to Purchaser, are complete and correct and represent actual, bona fide transactions and have been maintained in accordance with sound business practices, including the maintenance of an adequate system of internal controls.  The minute books of the Company, all of which have been made available to Purchaser, contain accurate and complete records of all meetings held of, and corporate action taken by, the shareholders, the board of directors and committees of the board of directors of the Company, and no meeting of any such shareholders, board of directors or committee has been held for which minutes have not been prepared or are not contained in such minute books.

(h)     All accounts receivable that are reflected on the Balance Sheet or on the accounting records of the Company as of the Closing Date represent or will represent valid obligations arising from sales actually made or services actually performed by the Company in the ordinary course of business. Except to the extent paid prior to the Closing Date, such accounts receivable are or will be as of the Closing Date collectible net of (i) the respective reserves shown on the Balance Sheet, (ii) matters shown in Section 5.7 of the Company Disclosure Schedule and (iii) any retainage obligations specifically set forth in the written terms of the applicable contracts.  Subject to such reserves and retainage, each of such accounts receivable either has been or will be collected in full, without any setoff, within one (1) year after the day on which it first becomes due and payable pursuant to the applicable contract, including any retainage obligations. There is no contest, claim, defense or right of setoff, under any Contract with any account debtor of an account receivable relating to the amount or validity of such account receivable.  Section 5.7(h) of the Disclosure Schedule contains a complete and accurate list of all accounts receivable as of the date hereof, which list sets forth the aging of each such account receivable.

Section 5.8     Material Contracts.

(a)     Section 5.8 of the Company Disclosure Schedule sets forth a correct and complete list of the following types of Contracts to which the Company is bound, other than any Contract that has terminated and is of no further force or effect (the "Material Contracts"):

(i)     indentures, credit agreements, security agreements, mortgages, guarantees, promissory notes and other Contracts relating to or evidencing Indebtedness of the Company;

(ii)     each Contract under which the Company is obligated to sell or lease real property;

(iii)     each Contract involving or expected to involve payments of more than $20,000, in the aggregate, in any calendar year to or by the Company (other than ordinary course Contracts for the purchase of Inventory and raw materials by the Company);

22

        (iv)    each Contract requiring the Company to pay commissions or similar fees to another Person based on the sales of the Company;

        (v)    each Contract with a distributor of the Company;

        (vi)    each collective bargaining or similar Contract;

        (vii)    each Contract that contains noncompetition, nonsolicitation, exclusivity or similar provisions that limit the activities of the Company or any employees or consultants of the Company in a manner adverse to the Company;

        (viii)   (A) each employment Contract providing for payments equal to or exceeding $100,000 per year; and (B) each consulting, change-in-control, retention, incentive, severance or other executive compensation Contract;

        (ix)    each Contract with an Affiliate of the Company;

        (x)    each Contract that is a partnership agreement, limited liability company or joint venture agreement;

        (xi)    each Contract granting a Lien upon any material asset of the Company, other than Permitted Liens;

        (xii)    each Contract relating to the acquisition or sale of a business (or any material portion of the assets thereof), whether or not consummated;

        (xiii)    each Contract relating to the development, ownership, licensing or use of any Intellectual Property, or covenant not to sue with respect thereto, other than agreements for software commercially available on reasonable terms to the public generally with annual license, maintenance, support and other fees of less than $1,000 per copy, seat, CPU, or named user, or aggregate fees of less than $5,000;

        (xiv)    each Contract involving the settlement of any Proceeding or threatened Proceeding; and

        (xv)    each Contract under which the Company agrees to enter into any of the foregoing transactions or agreements.

        (b)    Each Material Contract set forth in or required to be set forth in Section 5.8 of the Company Disclosure Schedule is a valid and binding agreement of the Company, and is enforceable in accordance with its terms against the Company and, to Sellers' Knowledge, the other parties thereto, subject in each case to the Remedies Exception. Neither the Company nor, to Sellers' Knowledge, any other party to any Material Contract has materially violated or breached, or committed any material default under, any Material Contract and no event exists that is, or with notice or passage of time would constitute a breach or default. The Company has not received any written notice of any actual or alleged violation, breach, default or termination under any Material Contract. No Material Contract that provides for the Company to provide products or services on a "fixed price" basis requires the Company to

23

provide goods and services for a price less than the direct cost as determined in accordance with GAAP of providing such goods or services except for Liabilities reflected on the Balance Sheet or as noted in Section 5.8 of the Company Disclosure Schedule. Correct and complete copies of the Material Contracts have previously been made available to Purchaser. The Company has not relied on any minority business, small business or other similar set aside or qualification to obtain any Contract. All bids and responses to "requests for proposal" and similar solicitations of business made by the Company have been made in compliance with Law and did not contain any materially inaccurate information or statements.

Section 5.9    Title to Assets; No Liens. The Company has good and marketable title to, or a valid leasehold interest in, the personal property used in the conduct of the Company's business, located on its premises and reflected on the Balance Sheet or acquired since the date thereof, free and clear of all Liens (except Permitted Liens), except assets disposed of in the ordinary course of business consistent with past practice since the date of the Balance Sheet, none of which are material to the Business.

Section 5.10    Real Property.

(a)    The Company does not own, and has never owned, any real property. Section 5.10(a) of the Company Disclosure Schedule sets forth a correct and complete list of all (i) leases of real property (such real property, the "Leased Real Property") to which the Company is currently a party or by which it is currently bound (each a "Lease"); and (ii) leases of real property to which the Company was previously a party or by which it was previously bound. A true, complete and correct copy of each written Lease (including all amendments and other modifications) has been made available to Purchaser prior to the date hereof. The Leased Real Property collectively constitutes all real property held or used by the Company to conduct, operate or manage its business. The Company has good and valid leasehold title to all Leased Real Property, in each case free and clear of any Liens except Permitted Liens.

(b)    Each Lease is valid and binding on the Company and, to Sellers' Knowledge, on the other parties thereto, is in full force and effect in accordance with its terms (subject to the Remedies Exception), and is the entire agreement between the Company and the applicable landlord.

(c)    The Company has paid all rent and other amounts owed under each Lease (including any utility charges, common area maintenance charges, real property taxes or assessments payable by the Company under each Lease), and the Company has performed in all material respects all other obligations required to be performed by it under each Lease.

(d)    No security deposit under any Lease has been applied in respect of a breach or default under such Lease that has not been re-deposited in full.

(e)    The Company does not owe any brokerage commissions or finder's fees with respect to any Lease.

(f)    The Company has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property.

24

(g)   The Company is not and, to Sellers' Knowledge, no other party is, or alleged to be, in default under any Lease, and no event exists that is, or with notice or lapse of time would constitute, a default under any Lease, and no landlord under a Lease has given notice of any repairs, upgrades or remodeling that the Company must perform as tenant.

(h)   The Company is not a party to any agreement, contract or understanding, materially affecting any Leased Real Property.

(i)   The Company has delivered to Purchaser correct and complete copies of all surveys of the Leased Real Property in the Company's or any Seller's possession or reasonably available to the Company on any Seller, and the Company and Sellers are not aware of any material change in the facts each such survey depicts.

(j)   No portion of the Leased Real Property is subject to any pending or, to Sellers' Knowledge, threatened condemnation or similar proceeding by any public or quasi-public authority, and, to Sellers' Knowledge, there is no threatened condemnation or similar proceeding with respect thereto.

(k)   No material legal or administrative proceeding relating to any Leased Real Property is pending or, to Seller's Knowledge, threatened.

(l)   The physical condition of the Leased Real Property is sufficient to permit the continued conduct of the business of the Company as presently conducted subject to the provision of usual and customary maintenance and repair performed in the ordinary course of business with respect to similar properties of like age and construction.  Each Leased Real Property is adequately served by electrical, gas, storm sewer, sanitary sewer, water, internet, telecommunications and other utilities as necessary or appropriate to operate the Company's Business.

(m)   There are no parties in possession of the Leased Real Property other than the Company.

(n)   The use, occupancy, operation and maintenance of the Leased Real Property by the Company is in compliance in all material respects with all applicable Laws (including those relating to zoning, land division, building, fire, health and safety), does not violate any restrictive covenant or any provision of any Law, is not subject to "permitted nonconforming" use or structure classifications, and is not a use that is the subject of a condition use permit or zoning variance, and to Sellers' Knowledge, there are no pending or contemplated changes in the zoning of the Leased Real Property.

(o)   All buildings, structures, fixtures and improvements located on the Leased Real Property are in compliance in all material respects with Laws (including those pertaining to zoning, building, the disabled, fire, health and safety) and requirements under the applicable Lease(s), and such buildings, structures, fixtures and improvements are (i) in good repair, (ii) in good condition, ordinary wear and tear excepted, and (iii) free of material defects.

25

Section 5.11   <u>Intellectual Property</u>.

(a)      <u>Section 5.11(a)</u> of the Company Disclosure Schedule sets forth a true and complete list of all of the Company Registered Intellectual Property, including for each item listed, as applicable, the owner, the jurisdiction, the application/serial number, the patent/registration number, the filing date, and the issuance/registration date.  <u>Section 5.11(a)</u> of the Company Disclosure Schedule also sets forth all material unregistered trademarks, service marks, logos and trade names owned by the Company.

(b)      The Company does not have any Liability to make any payments by way of royalties, fees or otherwise to any owner or licensor of, or other claimant to, any Intellectual Property.

(c)      The Company Registered Intellectual Property is valid, subsisting, enforceable and in full force and effect and the Company Registered Intellectual Property has not expired or been cancelled or abandoned, and is not subject to any pending or threatened opposition, cancellation, interference or similar proceeding.   All necessary registration, maintenance and renewal fees currently due in connection with the Company Registered Intellectual Property have been made, and all necessary documents, recordations and certificates in connection with the Company Registered Intellectual Property have been filed with the relevant authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Company Registered Intellectual Property.  There are no actions that must be taken by the Company or Purchaser within ninety (90) days of the Closing Date for the purposes of maintaining, perfecting, prosecuting, preserving or renewing any Company Registered Intellectual Property.  The Company owns all right, title, and interest (including the sole right to enforce), free and clear of all Liens, in and to all Company Intellectual Property (except for title with respect to Intellectual Property licensed to the Company), and with respect to Company Registered Intellectual Property, is listed in the records of the appropriate United States, state and/or foreign authorities as the sole owner for each item thereof.  The Company has not (i) transferred ownership of, or except in the ordinary course of business to customers of the Company granted any license of or right to use, or authorized the retention of any rights to use or joint ownership of, (A) any Intellectual Property relating to the Products or Products in Development that is or was Company Intellectual Property; or (B) any other material Intellectual Property that is or was Company Intellectual Property, or (ii) permitted the Company's rights in such Company Intellectual Property to enter into the public domain.

(d)      The Company has taken commercially reasonable steps to obtain, maintain and protect the Company Intellectual Property.   The Company has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of its trade secrets and Confidential Information, and any trade secrets and confidential information of third parties provided thereto.  No current or former employees, consultants or contractors of the Company own, or have any right to royalties or other payments with respect to, any Intellectual Property used or held for use by or related to the Company.  As of the Closing Date, no Seller or any of its Affiliates owns any Intellectual Property used or held for use by or related to the Business or the Company.  No current or former customer or client of the Company owns or has exclusive rights to use any Intellectual Property that is used by the Company.

26

(e)     The Company Intellectual Property, operation of the Company's Business and the Company's products and services do not infringe, conflict with, misappropriate, or otherwise violate any rights of any Person in or to any Intellectual Property. The Company has not received written notice from any Person claiming that the Company Intellectual Property, the operation of the Company's Business or its products or services infringe, conflict with, misappropriate or otherwise violate the rights of any Person in or to any Intellectual Property (nor does there exist any basis therefor to Sellers' Knowledge). The Company Intellectual Property and the Intellectual Property licensed to the Company is all of the Intellectual Property used in or necessary for the operation of the Company's Business.

(f)     The Company has not received any written notice by any other Person claiming any ownership of or right to use any of the Company Intellectual Property. To Sellers' Knowledge, no other Person is infringing upon, violating or misappropriating any of the Company Intellectual Property in any way. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will impair in any way the Company's exercise of any rights with respect to Intellectual Property used or held for use by the Company, or require the consent of any Person in respect of such Intellectual Property.

Section 5.12    Information Technology.  None of the software, computer hardware (whether general or special purpose), telecommunications capabilities (including all voice, data and video networks) and other similar or related items of automated, computerized, and/or software systems and any other networks or systems and related services that are used by or relied on by the Company in the conduct of the Business has experienced bugs, failures, breakdowns, or continued substandard performance in the past twelve (12) months.

Section 5.13    Litigation.  There is no suit, litigation, arbitration, mediation, claim, action, proceeding or, to Sellers' Knowledge, investigation (each, a "Proceeding") by or before any Governmental Authority (a) pending, or to Sellers' Knowledge, threatened in writing against the Company, (b) instituted by the Company or (c) to Sellers' Knowledge, involving the Company's business or assets. Neither the Company, nor its business or assets, is subject to any outstanding Order by a Governmental Authority.

Section 5.14    Customers and Suppliers.  Section 5.14 of the Company Disclosure Schedule sets forth a correct and complete list of the names of each of (a) the ten (10) largest (in terms of dollar amount) customers of the Company for the fiscal year ended December 31, 2011, showing the total sales to each such customer during such period; and (b) the ten (10) largest (in terms of dollar amount) suppliers of the Company for the fiscal year ended December 31, 2011, showing the total purchases from each such supplier during such period. Since December 31, 2011, there has been no material adverse change in the business relationship of the Company with any customer or supplier named or required to be named on Section 5.14 of the Company Disclosure Schedule. Since December 31, 2011, none of Sellers or the Company has received any written communication from any customer or supplier named or required to be named on Section 5.14 of the Company Disclosure Schedule of any intention to terminate or materially reduce purchases of the Company's products from or supply of materials to the Company or to otherwise change the relationship with the Company.

27

Section 5.15    Compliance with Laws and Regulations; Permits.

(a)      The Company and the business and operations of the Company are, and have been during the past five (5) years, in compliance with all applicable Laws. In the last five (5) years, the Company has not received any notice, Order or other communication from any Governmental Authority or other Person alleging, and there are no facts or circumstances that would reasonably be expected to give rise to, any actual or potential Liability or violation of or failure to comply with any applicable Laws.

(b)      There is no, and has not been during the past five (5) years, any actual or potential action or investigation in respect of the business or operations of the Company by any Governmental Authority with respect to the Company or its business.

(c)      No event has occurred or circumstance exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by the Company of, or a failure on the part of the Company to comply with, any Law or (B) may give rise to any obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(d)      The Company holds, and is operating in compliance with, all Permits necessary for the lawful conduct of its business and operations as presently conducted. Section 5.15(d) of the Company Disclosure Schedule contains a correct and complete list of all Permits of the Company. Each Permit held by the Company is in full force and effect without any default or violation thereunder by the Company. No Proceeding is pending or, to Sellers' Knowledge, threatened by any Governmental Authority to revoke or deny the renewal of any Permit of the Company.

Section 5.16    Brokers.    No Person is or will be entitled to a broker's, finder's, investment banker's, financial advisor's or similar fee from Sellers or the Company in connection with this Agreement or any of the transactions contemplated hereby.

Section 5.17    Environmental Matters.

(a)      The Company is now and has always been in compliance with all Environmental Laws.

(b)      The Company holds and is in compliance with all Environmental Permits for the operation of its business as presently conducted.

(c)      The Company has not received any written notice of any violation of, or Liability under, any Environmental Laws, including any such written notice of any environmental investigatory, corrective or remedial obligation, nor, to Sellers' Knowledge, is there any basis for such notice.

(d)      The Company has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or released any Hazardous Materials in violation of any applicable Environmental Laws or in a manner which would otherwise result in any Liability to the Company.

28

(e)    There are not now, nor to Sellers' Knowledge have there ever been, underground tanks on any Leased Real Property.

(f)    There are no Environmental Claims pending or, to Sellers' Knowledge, threatened against the Company.

(g)    The Company has not entered into any consent decree, agreement or order and is not subject to any Order, notice, demand, request for information, action, suit, proceedings, arbitration, investigations, and/or remediation imposing any material Liability or requirement to investigate or clean up any Hazardous Materials under any applicable Environmental Law.

(h)    There have been no Releases of any Hazardous Materials at any Leased Real Property or, to Sellers' Knowledge, at any other location, that would reasonably be expected to form the basis of any Environmental Claim against or affecting the Company.

(i)    All reports, non-privileged memoranda and other similar documents concerning environmental assessments, studies, compliance audits, or other environmental reviews, which contain material information relating to the Company and are in the possession or control of Sellers or the Company, have been provided to Purchaser.

(j)    No property to which the Company has directly, or indirectly transported, or arranged for the transportation of any Hazardous Material is listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA and/or on CERCLIS or on any similar federal or state list of sites requiring investigation or cleanup.

Section 5.18    Employee Matters.

(a)    The Company is not a party to any collective bargaining agreement or similar agreement, and there are no labor unions or other organizations representing, purporting to represent or, to Sellers' Knowledge, attempting to represent, any employee of the Company. There are no unfair labor practice complaints pending against the Company before the National Labor Relations Board or any other Governmental Authority nor, to Sellers' Knowledge, are any such complaints threatened.  The Company has not, with respect to any employees of the Company, experienced any strike, slowdown, picketing, lockouts or other organized work interruption during the past three years, nor, to Sellers' Knowledge, are any such strikes, slowdowns, picketings, lockouts or other organized work interruptions threatened.

(b)    The Company has not violated any applicable Law regarding the terms and conditions of employment of employees, former employees or prospective employees or other labor related matters, including without limitation any laws, orders, judgments or awards relating to wrongful discharge, discrimination, personal rights, wages, hours, collective bargaining, fair labor standards, or occupational safety and health.  Without limiting the foregoing, the Company is in compliance with the Immigration Reform and Control Act of 1986 and maintains a current Form I-9, to the extent required by such Act, in the personnel file of each employee.  The Company has not received any notice from any Governmental Authority that any documentation used in connection with a Form I-9 for any current employee may be invalid, including without limitation any "no-match" letter from the Social Security Administration.

29

Purchaser has previously been provided with a schedule setting forth the names, current annual salary or current hourly wages, bonus opportunity, hire date, accrued paid-time-off and principal work location of all employees of the Company as of the date such schedule was provided. Except as set forth on Section 5.18(b) of the Company Disclosure Schedule, the Company does not engage or retain any independent contractors, consultants, agents or agency employees on a basis not terminable upon thirty (30) days or less prior notice without penalty or payment.

(c)     (i) The Company has paid in full to all of its employees or adequately accrued in accordance with GAAP for all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees; (ii) there is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or threatened before any Governmental Authority with respect to any persons currently or formerly employed by the Company; and (iii) the Company is not a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices.

(d)     In the five (5) years prior to the date of this Agreement, the Company has not effectuated (i) a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar state, local or foreign Law) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of the Company or (ii) a "mass layoff" (as defined in the WARN Act, or any similar state, local or foreign Law) affecting any site of employment or facility of the Company.

(e)     There are no Liabilities of the Company relating to workers' compensation benefits that are not insured against by a bona fide third-party insurance carrier. With respect to each Plan and with respect to each state workers' compensation arrangement that is funded wholly or partially through an insurance policy or public or private fund, all premiums required to have been paid to date under such insurance policy or fund have been paid.

Section 5.19   Employee Benefit Plans.

(a)     Section 5.19 of the Company Disclosure Schedule lists all material Employee Benefit Plans. The Company has made available to Purchaser true and complete copies of (i) each written material Employee Benefit Plan (including any amendments thereto) and descriptions of all material terms of any such Plan that is not in writing; (ii) copies of each summary plan description for the material Employee Benefit Plans and any other notice or description provided to employees (as well as any modifications or amendments thereto); (iii) all trust documents, investment management contracts, custodial agreements, insurance policies or Contracts and other funding arrangements relating to any Employee Benefit Plan; (iv) the three most recent annual reports with accompanying schedules and attachments, filed with respect to each Employee Benefit Plan required to make such a filing, (v) the three (3) most recent annual financial statements, actuarial reports and trustee reports for each Employee benefit Plan (as applicable); (vi) all material records, notices and filings concerning IRS or Department of Labor audits or investigations and "prohibited transactions" within the meaning of Section 406 of ERISA or Section 4975 of the Code (including Forms 5330), and (vii) the most recent determination letter from the IRS and each currently pending application to the IRS for a determination letter for any Employee Benefit Plan intended to qualify under Section 401(a) of

30

the Code.  The Company has not made any binding commitment to create any additional material Employee Benefit Plan or modify or change any existing material Employee Benefit Plan.

(b)     With respect to each Employee Benefit Plan: (i) if intended to qualify under Section 401(a) of the Code, such Employee Benefit Plan has received a favorable determination letter or is entitled to rely on a favorable opinion letter from the IRS, in either case, that has not been revoked and, to the knowledge of the Company, no event or circumstance exists that has adversely affected or would reasonably be expected to adversely affect such qualification or exemption; (ii) such Employee Benefit Plan has been operated and administered in material compliance with its terms and all applicable Law (including but not limited to ERISA and the Code); (iii) there are no pending or threatened claims against, by or on behalf of any Employee Benefit Plans or the assets, fiduciaries or administrators thereof (other than routine claims for benefits); (iv) no breaches of fiduciary duty or other failures to act or comply in connection with the administration or investment of the assets of an Employee Benefit Plan in connection with which the Company or an Employee Benefit Plan fiduciary would reasonably be expected to incur a liability have occurred; (v) no non-exempt prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code has occurred; (vi) no lien has been imposed under the Code or ERISA; and (vii) all contributions (including all employer contributions and employee salary reduction contributions), premiums and expenses to or in respect of such Employee Benefit Plan have been timely paid in full or, to the extent not yet due, have been adequately accrued on the Balance Sheet.  No excise tax could reasonably be expected to be imposed upon the Company under Chapter 43 of the Code.  No filing has been made in respect of any Employee Benefit Plan under the Company Employee Plans Compliance Resolution System or the Department of Labor Delinquent Filer Program.

(c)     No Employee Benefit Plan is, and neither the Company nor any ERISA Affiliate thereof contributes to, has ever contributed to, or has any obligation or Liability with respect to any Plan that is (i) a "multiemployer plan" (within the meaning of Section 3(37) of ERISA), (ii) a "multiple employer plan" (within the meaning of Section 413(c) of the Code), (iii) a single employer plan or other pension plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code, or (iv) a multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA).

(d)     The Company does not have any obligation to provide health, accident, disability, life insurance or death benefits with respect to any current or former employees, consultants or directors or any retirees of the Company, or the spouses, dependents or beneficiaries of any of the foregoing, beyond the termination of employment or service of any such employee, consultant, director or retiree, whether under an Employee Benefit Plan or otherwise, other than as required under Section 4980B of the Code or other applicable Law.

(e)     None of (i) the Company, with respect to any Employee Benefit Plan, (ii) any Employee Benefit Plan or (iii) any fiduciary of any Employee Benefit Plan, in any case, is the subject of an audit or investigation by the IRS, the U.S. Department of Labor, the PBGC or any other Governmental Authority, nor is any such audit or investigation pending or, to the knowledge of the Company, threatened.

31

(f)      There is no Indebtedness owed by any current or former employee, consultant or director of the Company to the Company.

(g)      The Company and each of its ERISA Affiliates are in compliance in all material respects with (i) the applicable requirements of Section 4980B of the Code and any similar state law, and (ii) the applicable requirements of the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations (including the proposed regulations) thereunder.  No Employee Benefit Plan is a voluntary employee benefit association under Section 501(a)(9) of the Code.  Except as set forth on <u>Schedule 5.19</u> of the Company Disclosure Schedule, the obligations of all Employee Benefit Plans that provide health, welfare or similar insurance are fully insured by bona fide third-party insurers.  Except as set forth on <u>Schedule 5.19</u> of the Company Disclosure Schedule, no Employee Benefit Plan is maintained through a human resources and benefits outsourcing entity, professional employer organization, or other similar vendor or provider.

(h)      Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, either alone or in combination with another event (whether contingent or otherwise) will (i) entitle any current or former employee, consultant or director of the Company to any payment; (ii) increase the amount of compensation or benefits due to any such employee, consultant or director; or (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit.

(i)      No Employee Benefit Plan is subject to the laws of any jurisdiction outside of the United States or provides compensation or benefits to any employee or former employee of the Company (or any dependent thereof) which compensation or benefits are subject to the laws of any jurisdiction outside of the United States.

Section 5.20   <u>Sufficiency of Assets</u>.   The buildings, plants, offices, structures, equipment and other assets of the Company are sufficient for the continued conduct of the Company's business immediately after the Closing in the same manner as conducted immediately prior to the Closing in all material respects.

Section 5.21   <u>Affiliate Transactions</u>.  No Seller or any officer, director or Affiliate of the Company, or any individual related by blood, marriage or adoption to any such Person, (a) is a party to any Contract or transaction with the Company (except employment compensation paid to Nagel and Harrison and John Harrison, II in the ordinary course of business) or has any interest in any material property or asset owned, used or held for use by the Company, or (b) owns, directly or indirectly, any interest (except passive holdings for investment purposes of not more than five percent (5%) of the securities of any publicly held and traded company) in, or is an officer, director, manager, employee, or consultant of, any Person that is a competitor, lessor, lessee, customer or supplier of the Company or is otherwise engaged in the same or substantially similar business as the Company.

Section 5.22   <u>Insurance</u>.  <u>Section 5.22</u> of the Company Disclosure Schedule contains a correct and complete list of each material insurance policy owned by, or maintained for the benefit of, the Company.  The Company does not have any pending claims for insurance other than claims under Employee Benefit Plans in the ordinary course of business.  The Company is

not in default under any such insurance policy. All premiums due have been paid on such insurance policies, and the Company has not received any written notice of cancellation of any such insurance policy or written notice with respect to any refusal of coverage thereunder. Except as set forth on Section 5.22 of the Company Disclosure Schedule, the Company has no self-insurance or co-insurance program.

Section 5.23   Taxes.

(a)   The Company has duly and timely filed or caused to be timely filed with the appropriate Tax Authority all Tax Returns required to be filed by, or with respect to, such entity. All such Tax Returns are correct and complete in all material respects. All Taxes due and owing by the Company (whether or not shown as due on any Tax Return) have been timely paid. Except as set forth on Section 5.23(a) of the Company Disclosure Schedule, the Company is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by a Tax Authority in a jurisdiction where the Company does not file a Tax Return that the Company is or may be subject to taxation by that jurisdiction.

(b)   The unpaid Taxes of the Company did not, as of the date of the Balance Sheet, exceed the reserve for Tax liability (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet (rather than in any notes thereto). Since the date of the Balance Sheet, the Company has not incurred any liability for Taxes outside the ordinary course of business or otherwise inconsistent with past custom and practice.

(c)   No deficiencies for Taxes with respect to the Company have been claimed, proposed or assessed by any Tax Authority. There are no pending or, to Sellers' Knowledge, threatened audits, assessments or other actions by a Tax Authority for or relating to any liability in respect of Taxes of the Company. There are no matters under discussion with any Tax Authority, or known to the Company, with respect to Taxes that are likely to result in an additional liability of the Company for Taxes. No issues relating to Taxes of the Company were raised by the relevant Tax Authority in any completed audit or examination that would reasonably be expected to result in a material amount of Taxes of the Company in a later taxable period.

(d)   The Company (or any predecessor of the Company) has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, nor has any request been made in writing for any such extension or waiver. No power of attorney with respect to any Taxes of the Company has been executed or filed with any Tax Authority that is currently in effect.

(e)   There are no Liens for Taxes upon any property or asset of the Company (other than Permitted Liens).

(f)   The Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholders of the Company or other Person. The Company has properly

33

classified all individuals providing services to it as employees or non-employees for all Tax purposes.

(g)   The Company has delivered or made available to Purchaser complete and accurate copies of all material federal, state, local and foreign Tax Returns of the Company for all taxable years remaining open under the applicable statute of limitations, including, promptly upon their availability, for the most recent taxable year, and complete and accurate copies of all audit or examination reports and statements of deficiencies assessed against or agreed to by the Company (or any predecessors of the Company) since the last open taxable year.

(h)   The Company is not a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar Contract that is currently in effect.

(i)   The Company (i) has not consented at any time under former Section 341(f)(1) of the Code to have the provisions of former Section 341(f)(2) of the Code apply to any disposition of assets of the Company; (ii) has neither agreed, nor is required, to make any adjustment under Section 481(a) of the Code by reason of a change in accounting method or otherwise; and (iii) has not made any of the foregoing elections, and is not required to apply any of the foregoing rules, under any comparable state or local Tax provision.

(j)   The Company (i) has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code; (ii) has not been a shareholder of a "controlled foreign corporation" as defined in Section 957 of the Code (or any similar provision of state, local or foreign law); (iii) has not been a "personal holding company" as defined in Section 542 of the Code (or any similar provision of state, local or foreign law); (iv) has not been a shareholder of a "passive foreign investment company" within the meaning of Section 1297 of the Code; and (v) has not had a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise become subject to Tax jurisdiction in a country other than the country of its formation.

(k)   The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing Date as a result of any installment sale or other transaction on or prior to the Closing Date, any accounting method change or agreement with any Tax Authority, any prepaid amount received on or prior to the Closing or any intercompany transaction or excess loss account described in Section 1502 of the Code (or any corresponding provision of state, local or foreign Tax law).

(l)   The Company has not been a party to a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

(m)   Neither the Company nor any predecessor by merger or consolidation has been a party to any transaction intended to qualify under Section 355 of the Code.

34

(n)     The Company has been a validly electing "S corporation" within the meaning of Sections 1361 and 1362 of the Internal Revenue Code of 1986, as amended (the "Code") at all times since March 16, 1987 and will be an S corporation for federal (and, where applicable, state) income tax purposes up to and including the Closing Date. The IRS has not challenged or threatened to challenge the status of the Company as an S corporation for federal income tax purposes under the Code. The Company has not, within the past ten years, (i) acquired assets from another corporation in a transaction in which the Company's tax basis of the acquired assets was determined, in whole or in part, by reference to the tax basis of the acquired assets in the hands of the transferor, or (ii) acquired the stock of any corporation for which an election was made under Section 1361(b)(3)(B) of the Code to be treated as a "qualified subchapter S subsidiary". No Tax will be imposed under Section 1374 of the Code or any corresponding provisions of the laws of each jurisdiction in which the Company is obligated to file income or franchise Tax Returns or any other applicable jurisdiction as a result of the transactions contemplated by this Agreement, and the Company will not be liable for any Tax under Section 1374 if its assets were sold for their fair market value as of the Closing Date.

(o)     There has not been, within the preceding five (5) years, any audit of any Tax Return filed by a shareholder of the Company with respect to, or which may relate to, items of income, gain, deduction, loss or credit of the Company.

(p)     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, either alone or in combination with another event (whether contingent or otherwise) will give rise to any "excess parachute payment" under Section 280G of the Code.

(q)     Each Employee Benefit Plan and each other contract, plan, program, agreement, or arrangement maintained, established or entered into by the Company (i) was operated in good faith compliance with Section 409A of the Code or an available exemption therefrom from January 1, 2005 through December 31, 2008 (to the extent in existence during such period), and (ii) has been maintained and operated, since January 1, 2009 (to the extent in existence since such date), in documentary and operational compliance with Section 409A of the Code or an available exemption therefrom.  No compensation has been or would reasonably be expected to be includable in the gross income of any "service provider" (within the meaning of Section 409A of the Code) of the Company as a result of the operation of Section 409A of the Code.

(r)     There is no Contract, agreement, plan or arrangement to which the Company is a party which requires the Company to pay a Tax gross-up payment to any person, including without limitation, with respect to any Tax-related payments under Section 409A of the Code or Section 280G of the Code.

Section 5.24     Absence of Certain Developments.     Since December 31, 2011, the Company has conducted its business in all material respects in the ordinary course of business consistent with past practice and there has not been any Material Adverse Effect.  Except as set forth on Section 5.24 of the Company Disclosure Schedule, since such date the Company has not:

(a)      made any material change in any method of accounting or accounting practice, policy or procedure other than as required by GAAP;

(b)      amended its Governing Documents;

(c)      (A) declared, set aside, made or paid any dividend or other distribution or payments (whether in cash, stock or property or any combination thereof) in respect of any of its shares of capital stock or (B) redeemed or otherwise acquired any of its shares of capital stock, issued any new capital stock or granted any Person any right or option to acquire any shares of capital stock;

(d)      merged or consolidated with or acquired any business or any corporation, partnership, limited liability company, association or other business organization or division thereof, acquired a material amount of assets from any Person outside the ordinary course of business or made any loans, advances or capital contributions to, or any investments in, any Persons;

(e)      sold, leased, licensed or otherwise transferred any assets, securities, properties or interests of the Company, other than sales of Inventory in the ordinary course of business consistent with past practice;

(f)      entered into any joint venture, partnership or other similar Contract;

(g)      adopted a plan of complete or partial liquidation, dissolution, merger, consolidation, recapitalization or other reorganization or taken any action for the appointment of a receiver, administrator, trustee or similar officer;

(h)      instituted, compromised or settled any litigation or waived any claims or rights;

(i)      modified, amended, terminated or permitted the lapse of any lease or other Contract relating to any real property material to the business of the Company;

(j)      entered into, materially amended or terminated a Material Contract other than (A) in order to comply with applicable Law or (B) any termination at the expiration of its stated term;

(k)      entered into any Contract containing any provision or covenant limiting in any respect its ability to (A) sell or buy any products or services to or from any other Person, (B) engage in any line of business or (C) compete with any Person;

(l)      permitted any of its assets, properties or rights to become subjected to any Liens, other than Permitted Liens;

(m)      (A) paid, announced, promised, granted, made or agreed to make, whether orally or in writing, any increase in or establishment of (as applicable) any wages, base pay, fees, incentive pay, bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, fringe benefit, stock option, stock purchase, Employee Benefit Plan, or any other form

36

of compensation (except as required by applicable Law or, with respect to base salary or wage rates payable to non-executive employees only, in the ordinary course of business consistent with past practice), (B) hired or engaged any employee, consultant, director or service provider (except for non-executive employees with aggregate annual compensation below $50,000 hired in the ordinary course of business consistent with past practice), or (C) otherwise entered into, adopted or amended any material Employee Benefit Plan;

> (n)      incurred any Indebtedness;

> (o)      authorized, or made any commitment with respect to, any single capital expenditure that is in excess of $20,000 or capital expenditures that are, in the aggregate, in excess of $50,000;

> (p)      made, changed or revoked any material Tax election; entered into a settlement or compromise of any claim, notice, audit report or assessment in respect of Taxes; made a change in any annual Tax accounting period or adopted or changed any material method of Tax accounting; filed any Tax Return; entered into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or closing agreement relating to any Tax; surrendered any right to claim a material Tax refund; or consented to any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment; or

> (q)      sold, transferred, assigned, licensed, pledged, encumbered, abandoned, dedicated to the public, permitted to lapse, failed to maintain or otherwise disposed of any Intellectual Property.

Section 5.25    Products; Product Liability.  All products and services sold or provided by the Company have been in compliance with all applicable specifications, warranties and other Contract requirements.  The Company does not have, and there is no basis on which the Company will have, any Liability in respect of any products or services sold or provided by the Company prior to Closing.

Section 5.26    Absence of Certain Payments.  Neither the Company, nor any director, officer, agent, employee or other Person associated with or acting on behalf of the Company, has made any unlawful contributions, payments, gifts, entertainment or other unlawful expenses to obtain business or otherwise, or made any direct or indirect unlawful payments to any customers, government officials or other Person, or established or maintained any unlawful or unrecorded funds.

Section 5.27    Acquisition Proposals.  The Company is not party to or bound by any agreement with respect to any Acquisition Proposal (other than the letter of intent entered into with Purchaser or its Affiliate) and the Company has terminated all discussions with any third party (other than Purchaser), if any, regarding any Acquisition Proposal.

Section 5.28    Bank Accounts.  Section 5.28 of the Company Disclosure Schedule sets forth an accurate list of each bank, trust company, savings institution or other financial institution with which the Company has an account or safe deposit box and the names and identification of all Persons authorized to draw thereon or to have access thereto.

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

Section 6.1    Organization.  Purchaser is a corporation, duly organized, validly existing and in good standing under the Laws of Delaware and has the requisite power and authority to execute and deliver this Agreement and each Transaction Document to which it is a party and to perform its obligations hereunder and thereunder.

Section 6.2    Authority.  Purchaser has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary organizational action on the part of Purchaser.  Each of this Agreement and the Transaction Documents to which Purchaser is a party has been, or will be as of the Closing, duly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery by the other parties hereto or thereto, constitutes or will constitute a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to the Remedies Exception.

Section 6.3    Non-contravention.  Neither the execution or delivery of this Agreement nor any Transaction Document by Purchaser, nor the consummation by Purchaser of the transactions contemplated hereby and thereby, will: (a) conflict with, contravene or constitute a violation of (whether after the giving of notice, lapse of time or both) the Governing Documents of Purchaser; (b) contravene, conflict with or constitute a violation of (whether after the giving of notice, lapse of time or both) in any material respect, or require any Consent under, any material contract to which Purchaser is a party; or (c) contravene, conflict with or constitute a violation of (whether after the giving of notice, lapse of time or both) any Law or Order to which Purchaser is subject, in any material respect.

Section 6.4    Consents.  No material Consent, notification or filing of, with or to any Governmental Authority is required to be obtained or made by such Purchaser in connection with the execution and delivery of this Agreement or any Transaction Document or in connection with the consummation of the transactions contemplated hereby and thereby.

Section 6.5    Litigation.  There are no Proceedings pending or, to Purchaser's knowledge, threatened against or affecting Purchaser or any of its Affiliates, which could reasonably adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement or any Transaction Document to which such Purchaser or Affiliate is a party.

Section 6.6    Brokers.  No Person is or will be entitled to a broker's, finder's, investment banker's, financial advisor's or similar fee from Purchaser in connection with this Agreement or any of the transactions contemplated hereby.

38

# ARTICLE 7

## PRE-CLOSING COVENANTS

Section 7.1   Access to Information.   Upon reasonable notice, and except as may otherwise be required by applicable Law, Sellers shall afford, and shall cause the Company to afford, Purchaser's officers, employees, counsel, accountants and other authorized representatives reasonable access, during normal business hours throughout the period prior to the Closing, to the Company's properties, books, contracts and records and, during such period, the Company shall furnish promptly to Purchaser all information concerning its business, properties, results of operations and personnel as may reasonably be requested, provided that no information provided under this Section 7.1 shall affect or be deemed to modify any representation or warranty made by Sellers herein.   To the extent such assistance will not unreasonably interfere with the conduct of the business of the Company and subject to employee availability, such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and shall include providing copies of any materials, including relevant Tax Returns and supporting work schedules.

Section 7.2   Conduct of Business Prior to the Closing Date.   Except as required by applicable Law or as otherwise expressly permitted or required by the terms of this Agreement, from the date of this Agreement to the Closing, Sellers shall (a) promptly notify Purchaser of any event that has or would reasonably be expected to have a Material Adverse Effect and (b) conduct the business of the Company in the usual, regular and ordinary course in substantially the same manner as previously conducted and, to the extent consistent therewith, use commercially reasonable efforts to keep intact its business, keep available the services of its current employees and preserve its relationships with customers, suppliers, licensors, licensees, distributors and others.   Notwithstanding the foregoing, except as set forth in Schedule 7.2, as required by applicable Law or as otherwise expressly permitted or required by the terms of this Agreement, Sellers shall not, and shall cause the Company not to, do any of the following without the prior written consent of Purchaser:

(a)   make any material change in any method of accounting or accounting practice, policy or procedure other than as required by GAAP;

(b)   amend its Governing Documents;

(c)   (A) declare, set aside, make or pay any dividend or other distribution or payments (whether in cash, stock or property or any combination thereof) in respect of any of its shares of capital stock or (B) redeem or otherwise acquire any of its shares of capital stock, issue any new capital stock or grant any Person any right or option to acquire any shares of capital stock;

(d)   merge or consolidate with or acquire any business or any corporation, partnership, limited liability company, association or other business organization or division thereof, acquire a material amount of assets from any Person outside the ordinary course of

business or make any loans, advances or capital contributions to, or any investments in, any Persons;

(e)   sell, lease, license or otherwise transfer any Shares or any other assets, securities, properties or interests of the Company, other than sales of Inventory in the ordinary course of business consistent with past practice;

(f)   enter into any joint venture, partnership or other similar Contract;

(g)   adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, recapitalization or other reorganization or take any action for the appointment of a receiver, administrator, trustee or similar officer;

(h)   institute, compromise or settle any litigation or waive any claims or rights;

(i)   modify, amend, terminate or permit the lapse of any lease or other Contract relating to any real property material to the business of the Company;

(j)   enter into, materially amend or terminate a Material Contract other than (A) in order to comply with applicable Law or (B) any termination at the expiration of its stated term;

(k)   enter into any Contract containing any provision or covenant limiting in any respect its ability to (A) sell or buy any products or services to or from any other Person, (B) engage in any line of business or (C) compete with any Person;

(l)   permit any of its assets, properties or rights to become subjected to any Liens, other than Permitted Liens;

(m)   (A) pay, announce, promise, grant, make or agree to make, whether orally or in writing, any increase in or establishment of (as applicable) any wages, base pay, fees, incentive pay, bonus, insurance, severance, deferred compensation, pension, retirement, profit sharing, fringe benefit, stock option, stock purchase, Employee Benefit Plan, or any other form of compensation (except as required by applicable Law or, with respect to base salary or wage rates payable to non-executive employees only, in the ordinary course of business consistent with past practice), (B) hire or engage any employee, consultant, director or service provider (except for non-executive employees with aggregate annual compensation below $50,000 hired in the ordinary course of business consistent with past practice), or (C) otherwise enter into, adopt or amend any material Employee Benefit Plan;

(n)   incur any Indebtedness;

(o)   authorize, or make any commitment with respect to, any single capital expenditure that is in excess of $20,000 or capital expenditures that are, in the aggregate, in excess of $50,000;

(p)   make, change or revoke any material Tax election; enter into a settlement or compromise of any claim, notice, audit report or assessment in respect of Taxes; make a

40

change in any annual Tax accounting period or adopt or change any material method of Tax accounting; file any Tax Return; enter into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or closing agreement relating to any Tax; surrender any right to claim a material Tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment;

    (q) sell, transfer, assign, license, pledge, encumber, abandon, dedicate to the public, permit to lapse, fail to maintain or otherwise dispose of any Intellectual Property;

    (r) pay, discharge or satisfy any claims, suits, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction of liabilities and obligations in the ordinary course of business;

    (s) enter into any Contract to the extent consummation of the transactions contemplated by this Agreement or compliance by the Company or Sellers with the provisions of this Agreement would reasonably be expected to conflict with, or result in a material violation or material breach of, or material default (with or without notice, lapse of time or both) under, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation or to the loss of a benefit under, or result in the creation of any Lien (other than a Permitted Lien) in or upon any of the assets, properties or rights of the Company, or give rise to any material increased, additional, accelerated or guaranteed right or entitlements of any third party under, or result in any material alteration of, any provision of such Contract;

    (t) take any action that would reasonably be expected to cause any of the representations and warranties of Sellers to fail to be true and correct, or otherwise prevent, delay or impede the consummation of the transaction contemplated hereby; or

    (u) agree or commit to do any of the foregoing.

  Section 7.3 <u>Commercially Reasonable Efforts</u>.

    (a) Upon the terms and subject to the conditions set forth in this Agreement, Sellers and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do or cause to be done all things, necessary, proper or advisable to cause the conditions set forth in <u>Article 8</u> to be satisfied.

    (b) Sellers shall, and shall cause the Company to use all commercially reasonable efforts to (i) obtain all consents from any third parties required under any Material Contracts and (ii) deliver all notices required to be sent under any Material Contracts in connection with the transactions contemplated by this Agreement. Sellers shall promptly deliver to Purchaser a copy of each filing made, each notice given and each consent obtained by Sellers or the Company in connection with the transactions contemplated by this Agreement.

    (c) Sellers shall, and Sellers shall cause the Company to use reasonable best efforts to file, as soon as practicable after the date of this Agreement, all notices, reports and other documents required to be filed with any Governmental Authority with respect to the transactions contemplated by this Agreement, and to submit promptly any information requested by any such Governmental Authority.

41

Section 7.4    No Negotiation.  Sellers shall not, and shall cause the Company not to, directly or indirectly, encourage, solicit, initiate or engage in discussions or negotiations with, or provide any non-public information to, any Person concerning any merger, sale of substantial assets, sale of capital stock, equity interests or similar transactions involving Sellers or the Company or enter into any agreement with respect thereto and shall terminate any existing discussion or negotiations related thereto.  Sellers shall promptly communicate to Purchaser the terms of any Acquisition Proposal that they or the Company may receive.

Section 7.5    Notification.  Prior to Closing, Sellers and Purchaser shall promptly notify the other in writing of:

(a)    the discovery by the notifying Party of any event, condition, fact or circumstance that occurred or existed on or prior to the date of this Agreement and that caused or constitutes an inaccuracy in or breach (other than inaccuracies or breaches that individually and in the aggregate are immaterial) of any representation or warranty made by the notifying Party in this Agreement;

(b)    the discovery by the notifying Party of any event, condition, fact or circumstance that occurs, arises or exists after the date of this Agreement and that would reasonably be expected to cause or constitute an inaccuracy in or breach of any representation or warranty made by the notifying Party in this Agreement if (i) such representation or warranty had been made as of the time of the occurrence, existence or discovery of such event, condition, fact or circumstance, or (ii) such event, condition, fact or circumstance had occurred, arisen or existed on or prior to the date of this Agreement;

(c)    any breach of any covenant or obligation of the notifying Party under this Agreement;

(d)    any event, condition, fact or circumstance of which the notifying Party has knowledge that would make the timely satisfaction of any condition to Closing set forth in Article 8 that the notifying Party is required to satisfy impossible or reasonably unlikely.

No information received by a Party pursuant to this Section 7.5 or otherwise shall operate as a waiver with respect to or otherwise affect any representation, warranty, covenant or agreement made or given by the notifying Party in this Agreement or in any instrument delivered in connection herewith.

Section 7.6    Affiliate Agreements.  Sellers shall terminate without penalty and will cause their Affiliates to terminate without penalty each Contract between or among the Company, on the one hand, and Sellers or such Affiliates on the other hand, including without limitation the Shareholders Agreement and the Lease Agreement.  Sellers shall resign from any positions held in a fiduciary capacity, including trustees and plan administrators, and Purchaser shall designate successor fiduciaries as of the Closing Date.

42

## ARTICLE 8

## CONDITIONS PRECEDENT

Section 8.1     Conditions to Each Party's Obligations to Effect the Closing.     The respective obligations of each Party to effect the Closing are subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions:

(a)     Governmental Approvals.   All consents, approvals or authorizations (or waivers thereof) required to be obtained under applicable Law for the consummation of the transactions contemplated by this Agreement shall have been obtained.

(b)     No Injunctions or Restraints.   No applicable Law or judgment or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect.

Section 8.2     Conditions to Purchaser's Obligation to Effect the Closing.     The obligation of Purchaser to effect the Closing is subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions:

(a)     Representations and Warranties of Sellers.   The representations and warranties made by the Sellers herein with respect to the Company and the Sellers shall be true and correct as of the date hereof and as of the Closing Date in all material respects (except those containing qualifications therein with respect to materiality or Material Adverse Effect which shall be true in all respects), as if such representations and warranties were made as of the date hereof and as of the Closing Date (except as to any such representation or warranty that speaks as of a specific date, which must be true and correct as of such specific date), and Purchaser shall have received a certificate signed by Sellers to such effect.

(b)     Performance of Obligations of Sellers.   Sellers shall have performed in all material respects all obligations hereunder required to be performed by them at or prior to the Closing Date, and Purchaser shall have received a certificate signed by Sellers to such effect.

(c)     Absence of Material Adverse Effect.   No Material Adverse Effect shall have occurred.

(d)     Company Records.   Sellers shall have delivered to Purchaser (i) a certified copy of the Governing Documents of the Company certified by the appropriate authority as of a date as near as practicable to the Closing Date, (ii) a certificate of good standing with respect to the Company, issued by the appropriate government officials of its jurisdiction of incorporation or formation (as applicable) and each jurisdiction in which the Company carries on its business, and (iii) the original minute and stock books of the Company.

(e)     Closing Deliveries.   Sellers shall have delivered to Purchaser the documents contemplated by Section 3.1.

DM_US 31372147-16.054265.0520

(f)      Consents Obtained.  Sellers shall have delivered to Purchaser, in form and substance reasonably satisfactory to Purchaser, any required consents of third parties under all Material Contracts listed on Schedule 8.2(f).

(g)      No Termination or Adverse Change to Customers or Vendors.  None of the customers or vendors set forth on Schedule 8.2(g) shall have notified the Company or Sellers that it intends to change its relationship or any material terms upon which it will conduct business with the Company (such as an intention to terminate or not renew a Contract, to revise pricing, to decrease volume or to change the products purchased or sold) which would have a detrimental economic consequence in excess of $200,000.

(h)      Employees.  At least ninety percent (90%) of the employees of the Company as of the date hereof shall, as of the Closing Date, not have notified any Seller or the Company of their intention to resign or retire.

(i)      Board Approval.  Purchaser shall have obtained approval of its Board of Directors to consummate the transaction contemplated hereby.

Section 8.3      Conditions to Sellers' Obligation to Effect the Closing.  The obligations of Sellers to effect the Closing are subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions:

(a)      Representations and Warranties of Purchaser.  The representations and warranties of Purchaser contained herein shall be true and correct as of the date hereof and as of the Closing Date in all material respects (except those containing qualifications therein with respect to materiality or Material Adverse Effect which shall be true in all respects), as if such representations and warranties were made as of the date hereof and as of the Closing Date (except as to any such representation or warranty that speaks as of a specific date, which must be true and correct as of such specific date) and Sellers shall have received a certificate signed by Purchaser to such effect.

(b)      Performance of Obligations of Purchaser.  Purchaser shall have performed in all material respects all obligations hereunder required to be performed by it at or prior to the Closing Date, and Sellers shall have received a certificate signed by Purchaser to such effect.

(c)      Closing Deliveries.  Purchaser shall have delivered to Sellers the funds, certificates and other instruments and documents contemplated to be delivered by Purchaser pursuant to Section 3.2.

## ARTICLE 9

## POST-CLOSING COVENANTS AND AGREEMENTS

Section 9.1      Public Announcements; Confidentiality.

(a)      No press release or other public announcement concerning the transactions contemplated by this Agreement or the Transaction Documents shall be issued by any Seller, on the one hand, or Purchaser, on the other hand, without the prior consent of Purchaser or Sellers,

44

as the case may be (which consent shall not be unreasonably withheld, delayed or conditioned); provided however that Purchaser may make any such release or announcement as may be required by Law or any securities exchange without consent of Sellers.

(b)     Sellers agree to keep confidential and not to reveal to any Person the terms and conditions of this Agreement or the Transaction Documents, except as otherwise required by applicable Law, including with respect to Tax Returns.  In the event that Sellers are requested pursuant to, or required by, applicable Law or legal process to disclose the terms and conditions of this Agreement or the Transaction Documents to any Person they shall provide Purchaser prompt written notice of such request or requirement in order to enable Purchaser to seek an appropriate protective order or other remedy (and if Purchaser seeks such an order, Sellers will provide such cooperation as Purchaser shall reasonably request) or to consult with Purchaser with respect to taking steps to resist or narrow the scope of such request or legal process.

Section 9.2    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement ("Transfer Taxes") shall be borne equally by Sellers, on the one hand, and Purchaser, on the other hand.  Sellers and Purchaser (and their respective Affiliates) shall reasonably cooperate in preparing and filing all Tax Returns relating to such Taxes, fees and charges.

Section 9.3    Tax Matters.

(a)     Tax Indemnification.

(i)     Sellers, jointly and severally, shall pay or cause to be paid, shall be liable for, and shall indemnify, defend and hold each Purchaser Indemnified Party harmless from and against any Losses related to (A) Taxes imposed on or payable with respect to the Company for, or attributable to, any Pre-Closing Tax Period, (B) Taxes of Sellers or any of their Affiliates (other than the Company) for any Tax period, (C) the unpaid Taxes of any Person (other than the Company) imposed on the Company under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract, or otherwise and (D) any and all Losses incurred by a Purchaser Indemnified Party to the extent arising out of or resulting from the breach of an agreement or covenant made in this Section 9.3 by Sellers; provided, however, that Sellers shall not be liable for, and shall not indemnify, defend or hold any Purchaser Indemnified Party harmless from, any Taxes that were taken into account in the calculation of the Final Purchase Price.

(ii)     Payment in full of any amount due from Sellers under this Section 9.3(a) shall be made by Sellers (on behalf of such Sellers) to the affected party in immediately available funds at least two (2) business days before the date payment of the Taxes to which such payment relates is due, or, if no Tax is payable, within fifteen (15) days after written demand is made for such payment.

(b)     Allocation of Taxes.  Whenever it is necessary to determine the liability for Taxes of the Company for a Straddle Period, the determination of the Taxes for the portion of

45

the Straddle Period ending on and including, and the portion of the Straddle Period beginning after, the Closing Date shall: (a) in the case of Taxes paid on income, gross receipts or payroll, be determined by assuming that the Straddle Period consisted of two taxable years or periods, one which ended at the close of the Closing Date and the other which began at the beginning of the day following the Closing Date, and items of income, gain, deduction, loss or credit of the Company for the Straddle Period shall be allocated between such two taxable years or periods on a "closing of the books basis" by assuming that the books of the Company were closed at the close of the Closing Date, and (b) in the case of all other Taxes, the portion of such Tax related to the period ending on the Closing Date will be deemed to be the amount of such Tax for the entire period multiplied by a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period; provided, further that all employment and payroll Taxes imposed on the Company attributable to all sale or change of control bonuses and other similar Liabilities and the exercise of, or payments made with respect to, employee options, if any, regardless of whether such Taxes are incurred prior to, on or after the Closing Date, shall be allocated to the taxable year or period that is deemed to end on the Closing Date.

(c)     Preparation and Filing of Tax Returns.  Purchaser shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Company required to be filed after the Closing Date for taxable periods ending on or before the Closing Date and for any Straddle Period.  Purchaser shall permit Sellers and Sellers' tax accountants, attorneys and advisors to review and comment on each such Tax Return prior to filing thereof and to have reasonable access during normal business hours to the relevant accounting books and records of the Company in connection with such review.  Sellers shall pay to Purchaser Taxes imposed upon the Company and reflected on such Tax Returns allocable to the Pre-Closing Tax Period at least two (2) Business Days before payment of such Taxes (including estimated Taxes) is due to the relevant Tax Authority.

(d)     Tax Contests.

(i)     If any Tax Authority makes any claim relating to Taxes of the Company, then the Party hereto first receiving notice of such claim promptly shall provide written notice thereof to the other Party hereto; provided, however, that the failure of such Party to give such prompt written notice shall not relieve the other Party of any of its obligations under this Section 9.3, except to the extent that the other Party is actually prejudiced thereby.  Such written notice shall specify in reasonable detail the basis for such Tax claim and shall include a copy of all notices and communications relating to such claim.

(ii)     Sellers shall have the right to control, at Sellers' own expense, any audit, examination, contest, litigation or other proceeding (a "Tax Proceeding") in respect of the Company for any taxable period that ends on or before the Closing Date and for which Sellers agree in writing that they are responsible for the resulting Tax pursuant to Section 9.3(a); provided, however, that with respect to any proceeding involving the Company (A) Sellers shall provide Purchaser with a timely and reasonable summary of such Tax Proceeding and any material developments, (B) Sellers shall defend such Tax Proceeding diligently and in good faith and shall provide evidence satisfactory to Purchaser of Sellers' ability to satisfy any liability, (C) Purchaser shall be entitled to participate, at its own expense, in such Tax Proceeding and receive

46

copies of any written materials relating to such Tax Proceeding given to and received from the relevant Tax Authority and (D) Sellers shall not settle, compromise or abandon any such Tax Proceeding, if such action could have an adverse impact on Purchaser, any Affiliate of Purchaser or the Company, without obtaining the prior written consent of Purchaser, which consent shall not be unreasonably delayed or denied.

(iii)   In the case of a Tax Proceeding that relates to a Straddle Period, Purchaser shall control the conduct of and have the sole right to settle such Tax Proceeding, at its own expense, but Sellers shall have the right to participate in such Tax Proceeding at their own expense.

(e)   Tax Refunds.  All refunds or credits of Taxes of the Company attributable to any Pre-Closing Tax Period (excluding any refund or credit attributable to the carryback of a loss incurred in a Tax year beginning after the Closing Date (or portion of a Straddle Period following the Closing Date)) shall be for the benefit of Sellers and shall be paid to Sellers (net of any income Taxes imposed on Purchaser or the Company attributable to such refund or credit) on their behalf within ten (10) days after receipt or credit thereof by Purchaser or the Company.

(f)   Section 338(h)(10) Election.

(i)   At Purchaser's election, Sellers shall join Purchaser in making an election under Section 338(h)(10) of the Code (and any corresponding elections under state and local Tax Law) with respect to the acquisition of the Shares pursuant to this Agreement (collectively, the "Section 338(h)(10) Election"). The Sellers shall cooperate fully in making the Section 338(h)(10) Election, including executing and filing IRS Form 8023 and all other forms, returns, elections, schedules, and documents required to effect the Section 338(h)(10) Election (collectively, the "Section 338(h)(10) Election Forms").

(ii)   If Purchaser elects to make a Section 338(h)(10) Election, then the Parties agree to allocate the "aggregate deemed sales price", as determined pursuant to Treasury Regulation § 1.338-4(b), and "aggregate grossed-up basis", as determined pursuant to Treasury Regulation § 1.338-5(b), among the assets of the Company for federal income Tax purposes (and, where applicable, state and local income Tax purposes) in a manner consistent with the methodology set forth on Exhibit E (the "Allocation").  None of the Parties will take a position on any relevant Income Tax Return that is inconsistent with the Allocation unless required by applicable Law.

(iii)   Purchaser shall indemnify Sellers and their Affiliates against any incremental increase in Taxes imposed on Sellers to the extent attributable to the Section 338(h)(10) Election as compared to the Taxes that would have been paid in the absence of such election, including but not limited to Taxes on the additional payment under this Section 9.3(f)(iii), and shall make an additional payment equal to the income Taxes imposed on Sellers solely with respect to the payments under this Section 9.3(f)(iii); provided, however, that in no event shall Purchaser or the Company be liable for or indemnify Sellers or any of their Affiliates against any other Taxes or costs payable by Sellers except as otherwise set forth in this Agreement.

(iv)     Anything in any other agreement to the contrary notwithstanding, all liabilities and obligations between Sellers or their Affiliates on the one hand and the Company on the other hand under any Tax allocation or Tax sharing agreement in effect prior to the Closing Date (other than this Agreement) shall cease and terminate as of the Closing Date as to all past, present and future taxable periods.

(g)     Tax Treatment of Payments.  Sellers, Purchaser, the Company and their respective Affiliates shall treat any and all payments under this Section 9.3 and Article 10 as an adjustment to the Purchase Price for Tax purposes unless they are required to treat such payments otherwise by applicable Tax laws.

(h)     Coordination.  To the extent any provision of this Section 9.3 is inconsistent with the provisions of Article 10, this Section 9.3 shall control.

Section 9.4     Employee Matters.  Nothing in this Agreement shall, or shall be construed so as to: (a) prevent or restrict in any way the right of the Company or Purchaser to terminate, reassign, promote or demote any employee or other service provider of the Company (or to cause any of the foregoing actions) at any time, or to change (or cause the change of) the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees or other service providers, subject to the terms and conditions of the Harrison Employment Agreement and the Nagel Employment Agreement; (b) create any third-party rights in any current or former employee or other service provider of the Company (or any beneficiaries or dependents thereof); or (c) obligate Purchaser or the Company to adopt or maintain any Plan or other compensatory or benefits arrangement at any time, except that Purchaser shall to the extent reasonably practicable cause the Company to continue in effect each Plan existing as of the Closing for the benefit of Company employees (or a Plan with comparable benefits) through December 31, 2012.

Section 9.5     Confidential Information.  After the Closing Date, each Seller shall keep secret and retain in strictest confidence, and shall not use for the benefit of itself or others, all confidential or proprietary information relating to the Company or its products or services (the "Confidential Information"), including, without limitation, Intellectual Property, customer lists, details of client or consultant contracts, pricing policies, marketing plans or strategies, product development techniques or plans, business acquisition plans, designs and design projects, inventions and research projects relating to the Company's business, products or services and shall not disclose such Confidential Information to anyone other than Purchaser except with Purchaser's express written consent.  Notwithstanding the foregoing, the term "Confidential Information" shall not include any of the following: (a) such information that becomes or is already known to the public generally through no fault of Sellers or their respective Affiliates, (b) information that is required by Law to be disclosed; provided that prior to disclosing any information pursuant to this clause (b) Sellers shall give prior written notice thereof to Purchaser and provide Purchaser with the reasonable opportunity to contest or seek a protective order with respect to such disclosure and (c) such information as is necessary to prepare Tax Returns with any Governmental Authority for the period ending on or including the Closing Date.

Section 9.6     Employee Non-Solicitation.  For a period of five (5) years after the Closing Date, each Seller and its controlled Affiliates shall not take any action, directly or

48

indirectly, to knowingly solicit for employment or hire, or assist any other Person to solicit or hire, as an employee, consultant or otherwise any person who is a director, officer or employee of the Company.

Section 9.7   Non-Competition.

(a)   For a period of five (5) years after the Closing Date, each Seller and its Affiliates shall not, directly or indirectly, as a shareholder, bondholder, officer, director, employee or consultant or in any other capacity (i) become interested or engaged in any manner either alone or with any Person now existing or hereafter created, in the Competitive Activities in North America, or any other jurisdiction where the Business is currently conducted by the Company (the "Geographic Area"), (ii) knowingly aid or abet or give information or financial assistance to any Person that engages in the Competitive Activities in the Geographic Area, or (iii) solicit any current or former customer or client of the Company to sell any products or services related to the Business; provided, however, that each such Seller, its Affiliates and any group (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of which such Person is a member collectively may own as an investment, directly or indirectly, no more than five percent (5%) of the outstanding securities of any publicly held corporation. "Competitive Activities" means any activities of, related to or competitive with the Company or the Business. Notwithstanding the foregoing, if the stock or substantially all of the assets of the Company are sold, assigned or transferred to a party which is not an affiliate of Purchaser on a standalone basis (i.e. pursuant to a transaction in which the Company constitutes substantially all of the stock or assets being sold and not as part of a sale of the Purchaser or any of its direct or indirect parent companies) within three (3) years after the Closing Date, the five (5) year periods set forth in this Section 9.7(a) and Section 9.6 shall expire six (6) months after the consummation of said sale, assignment or transfer.

(b)   If the covenant set forth in Section 9.7(a) is determined by any court to be unenforceable by reason of its extending for too great of a period of time or over too great a geographic area, or by reason of its being too extensive in any other respect, such covenant shall be interpreted to extent only for the longest period of time and over the greatest geographic area, and to otherwise have the broadest application as shall be enforceable. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, which shall continue in full force and effect. Without limiting the foregoing, the covenants contained herein shall be construed as separate covenants, covering their respective subject matters, with respect to each of the separate cities, counties and states of the United States, and each other country, and political subdivision thereof, in which the Company's Business is being conducted.

ARTICLE 10

SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

Section 10.1   Survival of Representations and Warranties.   The representations and warranties of Sellers and Purchaser shall survive the Closing and shall terminate on the date that is twenty-four (24) months following the Closing Date; provided, however, that the representations and warranties contained in (a) Section 4.1 (Authority), Section 4.2 (Title to

49

Shares), Section 4.3 (Non-contravention), Section 5.1 (Organization and Good Standing), Section 5.2 (Authority), Section 5.3(a) and (c) (No Conflicts), Section 5.5 (Capitalization), Section 6.1 (Organization), Section 6.2 (Authority) and Section 6.3(a) and (c) (Non-contravention) (the "Fundamental Representations") shall survive forever, (b) Section 5.17 (Environmental Matters) and Section 5.19 (Employee Benefit Plans) shall survive until five (5) years after the Closing Date, and (c) Section 5.23 (Taxes) (the "Tax Representations") shall survive until ninety (90) days after the expiration of the applicable statute of limitations. Notwithstanding the foregoing, (i) in the event of fraud or criminal misconduct by a Seller or Purchaser in connection with a representation or warranty made by it hereunder, such representation or warranty shall continue in full force and effect without limitation in relation to claims based on such fraud or criminal misconduct and (ii) if a claim for indemnification for breach of a representation or warranty is made hereunder prior to the end of the applicable survival period, such representation or warranty shall survive, until such claim is finally resolved. Except as provided above with respect to breaches of representations and warranties, all covenants, agreements and indemnities set forth herein shall survive the Closing as set forth in this Agreement or, if no survival period is specified herein, until the expiration of the applicable statute of limitations. The right to indemnification or other remedy based on the representations, warranties, covenants and agreements contained herein will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement. Any party providing indemnification pursuant to this Article 10 is referred to herein as an "Indemnifying Party" and any Person entitled to indemnification pursuant to Section 10.2 or Section 10.3 is referred to herein as an "Indemnified Party".

Section 10.2   Indemnification by Sellers.

(a)   Each Seller severally agrees to indemnify and hold Purchaser and its Affiliates (including, after the Closing, the Company) and each of their respective officers, directors, employees and agents (each such Person, a "Purchaser Indemnified Party") harmless from and against (i) any and all Losses based upon or arising from any breach of any representation or warranty made by such Seller pursuant to Article 4; and (ii) any and all Losses based upon or arising from any failure by such Seller to perform any of its respective covenants or agreements contained herein.

(b)   Sellers, jointly and severally, agree to indemnify and hold each Purchaser Indemnified Party harmless from and against:

(i)   any and all Losses based upon or arising from any breach of any representation or warranty made by Sellers pursuant to Article 5;

(ii)   any and all Indebtedness of the Company to the extent not taken into account in the calculation of the Final Purchase Price under Section 2.3;

(iii)   any and all Company Expenses to the extent not taken into account in the calculation of the Final Purchase Price under Section 2.3;

50

(iv)   any and all Losses based upon or arising from (A) any infringement by any products or services of the Company in existence on or prior to Closing of any Intellectual Property of any Person, and (B) any improper use of any confidential information or other Intellectual Property of any Person; and

(v)   any and all Losses with respect to liabilities associated with the real property (i.e., land and buildings) located at 664 Linden Avenue, East Pittsburgh, PA 15112 other than Purchaser's obligations under the Lease Agreement.

Section 10.3   Indemnification by Purchaser.   Purchaser agrees to indemnify and hold Sellers, their respective Affiliates and each of their respective officers, directors, employees and agents (each such Person, a "Seller Indemnified Party") harmless from and against any and all Losses based upon or arising from:

(a)   any breach of any representation or warranty made by Purchaser pursuant to Article 6;

(b)   any claim (except for any claim arising from a breach of this Agreement by either Seller) made against Harrison, Linda L. Harrison, Nagel, Kathleen L. Nagel or JHJ Partnership by the beneficiary of any guaranty made by Harrison, Linda L. Harrison, Nagel, Kathleen L. Nagel or JHJ Partnership with respect to any of the three (3) Performance Bonds pursuant to (i) that certain General Indemnity Agreement dated January 24, 2011 by the Company, as principal, and each of JHJ Partnership, Harrison, Linda L. Harrison, Nagel and Kathleen L. Nagel, as indemnitors, in favor of Allegheny Surety Company and Hudson Insurance Company, as sureties, (ii) that certain General Agreement of Indemnity dated February 6, 2012 by the Company, as principal, and each of Nagel and Harrison, as indemnitors, in favor of Liberty Mutual Insurance Company, as surety, or (iii) that certain General Indemnity Agreement dated February 20, 1996 by the Company, as principal, and each of Harrison, Linda L. Harrison, Nagel and Kathleen L. Nagel, as indemnitors, in favor of The Mountbatten Surety Company, Inc., as surety; and

(c)   any failure by Purchaser to perform any of its covenants or agreements contained herein.

Section 10.4   Additional Provisions Regarding Indemnification Obligations. Notwithstanding Section 10.2 and Section 10.3, the rights to indemnification pursuant to the provisions of Section 10.2 and Section 10.3 are subject to the following limitations:

(a)   Subject to Section 10.6, the maximum aggregate Liability of Sellers to all Purchaser Indemnified Parties taken together for Losses for any claims for indemnification pursuant to Section 10.2(a)(i) and 10.2(b)(i) and (iv) shall be limited to an amount equal to the Final Purchase Price plus the aggregate amount of the Contingent Consideration (the "Cap").

(b)   No Seller shall be liable for Losses for any claims for indemnification pursuant to Section 10.2(a)(i) or 10.2(b)(i) (other than as a result of a breach of a Fundamental Representation) unless the total of all Losses for claims for indemnification against all Sellers pursuant to Section 10.2(a)(i) or 10.2(b)(i) (including as a result of a breach of a Fundamental Representation) shall exceed $50,000 in the aggregate (the "Threshold"), and then Sellers shall

51

be liable for all such Losses, including the initial $50,000. Liability of Sellers for Losses based upon or arising from a breach of a Fundamental Representation shall not be subject to the Threshold or the Cap.

       (c)    Notwithstanding the foregoing, the limitations set forth in this Section 10.4 shall not apply with respect to Losses arising out of fraud or criminal misconduct. For the avoidance of doubt, such limitations shall not apply to indemnities in this Agreement, other than indemnities for breaches of representations and warranties (and, in such case, only to the extent provided above).

       (d)    If any claim, action, suit, proceeding or demand is brought by a Person who is not a Party to this Agreement or an Affiliate thereof (a "Third Party Claim") against an Indemnified Party, and if such Party intends to seek indemnification with respect thereto pursuant to this Article 10, such Indemnified Party shall promptly, but in any event within twenty (20) Business Days after the Indemnified Party learns of the existence of the Third Party Claim, notify the Indemnifying Party in writing of the Third Party Claim; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation hereunder except to the extent the Indemnifying Party is materially prejudiced by the Indemnified Party's failure to give notice. The Indemnified Party will deliver to the Indemnifying Party, promptly after the Indemnified Party's receipt thereof, copies of all court papers relating to the Third Party Claim and notices and documents relating to the Third Party Claim received by the Indemnified Party from the Person that instituted the Third Party Claim.

       (e)    The Indemnifying Party will have the right to participate in or assume the defense of the Third Party Claim (in either case at the expense of the Indemnifying Party) with counsel of its choice reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party may assume the defense of the Third Party Claim only so long as (i) the Indemnifying Party delivers written notice to the Indemnified Party of its election to assume the defense of the Third Party Claim within ten (10) Business Days of receipt of written notice of such Third Party Claim from the Indemnified Party; (ii) the Indemnifying Party acknowledges in writing to the Indemnified Party that the Indemnifying Party is obligated to indemnify the Indemnifying Party for the full amount of all Losses related to such Third Party Claim; (iii) the Third Party Claim involves solely monetary damages (and does not seek an injunction or other equitable relief or involve criminal allegations); (iv) the Third Party Claim does not involve any current customer, supplier or employee of the Company; and (v) if successful, the Third Party Claim would not restrict or adversely affect the Indemnified Party or the conduct of its or its Affiliates' businesses or operations. Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party shall not be liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof; provided that the Indemnifying Party shall pay for one additional counsel (plus any required local counsel) for all Indemnified Parties if the counsel for the Indemnifying Party determines that a conflict of interest makes it inappropriate to have common counsel for the Indemnifying Party and the Indemnified Party. If the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with the provisions above, the Indemnified Party, at its sole cost and expense, may retain separate counsel, and participate in the defense of the Third Party Claim. If the Indemnifying Party has not assumed

the defense of such Third Party Claim within ten (10) Business Days of receipt of written notice of such Third Party Claim, the Indemnified Party will have the right to undertake, at the Indemnifying Party's sole cost and expense, the defense of such Third Party Claim. Each Party shall reasonably cooperate with the other Party in such defense and make available to the Party undertaking the defense of the Third Party Claim, on a mutually convenient basis, witnesses, pertinent records, materials and information in such Party's possession or under such Party's control relating to such Third Party Claim as may be reasonably requested by the Party undertaking the defense of the Third Party Claim, in each case excluding any privileged information. Sellers shall have the sole right on behalf of Sellers to assume the defense of any Third Party claim arising from a breach of the representations and warranties in Article 5.

(f)     Notwithstanding anything in this Section 10.4 to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other Party (which consent shall not be unreasonably delayed, withheld or conditioned), settle, compromise or discharge any Third Party Claim or admit any Liability or permit a default or consent to entry of any judgment with respect to any Third Party Claim; provided that, if the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall not be required to agree to any settlement, compromise or discharge of such Third Party Claim which the Indemnifying Party may recommend unless (i) it, by its terms, unconditionally releases the Indemnified Party completely from all Liability in connection with such Third Party Claim at the sole expense of the Indemnifying Party, (ii) it does not restrict or adversely affect the Indemnified Party or the conduct of its or its Affiliates' businesses or operations, (iii) it does not include an admission of wrongdoing or misconduct by the Indemnified Party, and (iv) it does not impose any injunctive or other equitable relief against the Indemnified Party.

Section 10.5   Set-Off. Purchaser is hereby authorized at any time and from time to time (upon identification of any Liability for which any Purchaser Indemnified Party is or may be entitled to indemnification under Article 10), to withhold and set-off and apply against any payment or payments of the Contingent Consideration that may be owed or may be payable in the future by Purchaser hereunder to Sellers, any amounts (the "Indemnified Amounts") subject to a pending indemnification claim by a Purchaser Indemnified Party pursuant to Article 10 even though the Indemnified Amounts may be contingent or unmatured.

Section 10.6   Alstom Claims. If the following representations and warranties are true and correct, then the maximum aggregate Liability of Sellers to all Purchaser Indemnified Parties for any claims by Alstom against the Company for alleged infringement of any Intellectual Property of Alstom based on the Company's use of any information, technology or Intellectual Property developed by the Company pursuant to (i) that certain Contract No. S 071 09717 (Agreement for the Design, Development, Manufacture, Testing and Furnishing of an Advanced Civil Speed Enforcement System (ACSES System)) dated November 11, 1997 by and between the Company and GEC Alsthom Transportation, Inc. and (ii) that certain Master Subcontractor Agreement dated on or about February 2004 by and between the Company and Alstom Signaling Inc. (including the related Statement of Work (Amtrak – ACSES II Project)) shall be Three Million and No/100 Dollars ($3,000,000):

(a)     To Sellers' Knowledge none of the Company's products or services infringe any Intellectual Property of Alstom;

53

(b)      None of the Company's products or services misappropriate or directly incorporate any confidential information or Intellectual Property owned by Alstom (although the function of such products or services may be compatible with Alstom products);

(c)      Neither Sellers nor the Company has received any claim by Alstom that the Company is infringing any Intellectual Property or misappropriating confidential information of Alstom; and

(d)      Sellers have provided Purchaser with true and accurate copies of all Contracts between the Company and Alstom which relate to or affect the Intellectual Property rights of Alstom or the Company.

## ARTICLE 11

## TERMINATION

Section 11.1    Termination.    This Agreement may be terminated and the transactions contemplated hereby abandoned any time prior to the Closing:

(a)      Upon the written agreement of Sellers and Purchaser;

(b)      By Purchaser, upon ten (10) Business Days' prior written notice to Sellers if, on or after the 90th day following the date hereof, any of the conditions set forth in Section 8.1 or 8.2 remains incapable of fulfillment as a result of events beyond the control of Purchaser and such condition is not waived by Purchaser;

(c)      By Sellers, upon ten (10) Business Days' prior written notice to Purchaser if, on or after the 90th day following the date hereof, any of the conditions set forth in Section 8.1 or 8.3 remains incapable of fulfillment as a result of events beyond the control of Sellers and such condition is not waived by Sellers;

(d)      By Sellers or Purchaser on or after the 90th day following the date hereof; provided, however, that no Party shall have the right to terminate this Agreement under this Section 11.1(d) if the failure of the Closing to have occurred on or before such date is the result of such Party's breach of this Agreement; or

(e)      By Sellers or Purchaser if the enactment and effectiveness of any applicable Law makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited.

Section 11.2    Procedure and Effect of Termination.    In the event of a termination under Section 11.1(b), (c), (d) or (e), the terminating Party shall give written notice of the termination to the other Party, and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any Party, upon delivery of such notice. Upon any termination hereof pursuant to Section 11.1, no Party to this Agreement shall thereafter have any further liability or obligation hereunder; provided, however, that no such termination shall relieve any Party hereto of any liability for fraud or any breach of this Agreement prior to the date of such termination.

54

# ARTICLE 12

## MISCELLANEOUS

Section 12.1   <u>Entire Agreement; Assignment</u>.   This Agreement, together with the Transaction Documents, contain the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other prior agreements between the parties and their respective Affiliates, representatives and agents in respect of such subject matter.   Neither this Agreement nor any rights or obligations hereunder may be assigned by any Party hereto without the prior written consent of the other parties hereto; <u>provided</u>, <u>however</u>, that: (a) Purchaser may assign its rights and obligations under this Agreement in whole or in part to any of its Affiliates without the prior written consent of any other Party hereto (provided that Purchaser shall remain liable hereunder following any such assignment); (b) Purchaser may assign its rights and obligations under this Agreement in whole or in part in connection with (i) a merger or consolidation involving Purchaser or any of its subsidiaries, (ii) a sale of stock or assets of Purchaser or any of its subsidiaries or (iii) dispositions of the business of the Company and any of its future subsidiaries or any part thereof (provided that Purchaser shall remain liable hereunder following any such assignment) (any such Affiliate or Person with whom Purchaser, the Company or their current or future subsidiaries enters into such a transaction, a "<u>Permitted Transferee</u>").   Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors, permitted assigns and legal representatives.

Section 12.2   <u>Notices</u>.   All notices, Consents, requests, instructions, approvals and other communications provided for in this Agreement shall be in writing and shall be deemed validly given upon personal delivery or one (1) Business Day after being sent by nationally recognized overnight courier service or on the date of transmission if sent by facsimile (so long as for notices or other communications sent by facsimile, the transmitting facsimile machine records electronic conformation of the due transmission of the notice), at the following address or facsimile number, or at such other address or facsimile number as a Party may designate to the other parties:

If to Purchaser:

Invensys Rail Corporation
2400 Nelson Miller Pkwy
Louisville, KY  40223
Facsimile:  (502) 618-8940
Attention:  Kimberly E. Taylor

DM_US 31372147-16.054265.0520

with copies to (which shall not constitute notice):

Invensys Rail
PO Box 85
Foundry Lane
Chippenham,
Wilshire SN1 5 IRT
United Kingdom
Facsimile: 44 (0) 1249 441026
Attn: James Ormrod

and

McDermott Will & Emery, LLP
227 West Monroe Street
Chicago, Illinois 60606
Facsimile: (312) 277-7641
Attn: Scott M. Williams

If to any Seller or Sellers:

John R. Harrison
213 Hytyre Farms Dr.
Gibsonia, Pennsylvania 15044

and

Harry C. Nagel
2817 McCully Road
Allison Park, Pennsylvania 15101

with a copy to (which shall not constitute notice):

Vuono & Gray
310 Grant Street, Suite 2310
Pittsburgh, PA 15219
Facsimile: (412) 471-4477
Attn: Mark Vuono

or to such other address as the Person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

Section 12.3   Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF DELAWARE.

56

Section 12.4    <u>Construction; Interpretation</u>.  The name assigned to this Agreement and the article and section captions used herein are for convenience of reference only and shall not affect the interpretation or construction hereof. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  All references to Articles and Sections refer to articles and sections of this Agreement. Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person. Unless the context otherwise requires: (a) a reference to a document includes all amendments or supplements to, or replacements or novations of, that document; (b) the use of the term "including" means "including, without limitation"; (c) the word "or" shall be disjunctive but not exclusive; (d) unless expressly provided otherwise, the measure of a period of one month or year for purposes of this Agreement shall be that date of the following month or year corresponding to the starting date; <u>provided</u> that if no corresponding date exists, the measure shall be that date of the following month or year corresponding to the next day following the starting date (for example, one month following February 18 is March 18, and one month following March 31 is May 1); (e) a reference to a statute, regulation, proclamation, ordinance or by-law includes all statutes, regulations, proclamations, ordinances or by-laws amending, consolidating or replacing it, whether passed by the same or another Governmental Authority with legal power to do so, and a reference to a statute includes all regulations, proclamations, ordinances and by-laws issued under the statute; (f) a reference to an entity includes any successor entity, whether by way of merger, amalgamation, consolidation or other business combination; (g) reference to a word defined hereunder shall apply equally to both the singular and plural forms of the terms defined; and (h) a reference to "$" or "dollars" mean the lawful currency of the United States.  The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party hereto.

Section 12.5    <u>Company Disclosure Schedule</u>.  Neither the specification of any dollar amount in the representations or warranties contained in this Agreement nor the inclusion of any specific item in the Company Disclosure Schedule hereto is intended to imply that such amounts, or higher or lower amounts of the items so included or other items, are or are not material or that such fact or matter would with any other fact or matter, individually or in the aggregate, have a Material Adverse Effect.

Section 12.6    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns and, except as provided in Article 10, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 12.7    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party hereto.

DM_US 31372147-16.054265.0520

Section 12.8    Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

Section 12.9    Jurisdiction and Venue.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN THE CITY OF WILMINGTON OR OF THE UNITED STATES OF AMERICA FOR THE DISTRICT OF DELAWARE, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND APPELLATE COURTS FROM ANY THEREOF.  EACH PARTY HERETO HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF TO SUCH PARTY BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO SUCH PARTY AT ITS ADDRESS SPECIFIED IN SECTION 12.2, OR BY ANY OTHER METHOD PERMITTED BY LAW.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE TRIAL BY JURY, AND EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

Section 12.10   Remedies.  The Parties agree that irreparable damage could occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled, without posting a bond or similar indemnity, to seek an injunction to prevent breaches of this Agreement, or specific performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 12.11   Further Assurances.  In connection with this Agreement and the transactions contemplated hereby, each Party hereto shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and such transactions.

Section 12.12   Failure or Indulgence not Waiver.  No failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or any other right.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

Section 12.13   Amendments.  This Agreement may not be amended, supplemented or otherwise modified except in a written instrument executed by Purchaser and Sellers' Representative.

58

Section 12.14 <u>Fees and Expenses</u>.  Except as otherwise expressly provided in this Agreement, all fees, charges and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such fees, charges or expenses.

Section 12.15 <u>Sellers' Representative</u>.

(a)     Sellers' Representative.  In the event of the death or disability of either Seller, each Seller and its undersigned spouse hereby consents to (i) the appointment of the surviving Seller as such Seller's representative hereunder (the "<u>Sellers' Representative</u>") and as the attorney-in-fact for and on behalf of such Seller and his spouse, and (ii) the taking by Sellers' Representative of any and all actions and the making of any decisions required or permitted by, or with respect to, this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, the exercise of the power to (A) agree to execute any amendments to or termination of this Agreement or the other Transaction Documents, (B) agree to, negotiate or enter into settlements or compromises regarding, and comply with orders of courts, arbitrators or the Accounting Firm with respect to, the purchase price adjustment under <u>Section 2.3</u>, or the determination of the amount of any Contingent Consideration Payment pursuant to <u>Section 2.4</u>, (C) agree to, negotiate or enter into settlements and compromises of, and comply with orders of courts and awards of arbitrators with respect to, any Tax matters under <u>Section 9.3</u> and any indemnification claims under <u>Article 10</u>, (D) resolve or settle any indemnification claims or other disputes related to this Agreement, (E) receive and distribute among Sellers (or Sellers' estates) any amounts to be paid by Purchaser to Sellers or Sellers' Representative in accordance with this Agreement and (F) take all actions necessary in the judgment of Sellers' Representative for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

(b)     Each Seller and his spouse shall be bound by the actions taken by Sellers' Representative exercising the rights granted to him by this Agreement or the other Transaction Documents, and Purchaser shall be entitled to rely on any such action or decision of Sellers' Representative. Sellers' Representative shall not be entitled to any fee, commission, compensation or reimbursement for the performance of his services hereunder or the other Transaction Documents from Purchaser.

(c)     If Sellers' Representative shall die, become disabled, resign or otherwise be unable to fulfill his responsibilities hereunder, Sellers hereby appoint Mark T. Vuono as the new Sellers' Representative.  Such appointment will be effective upon such death, disability, resignation or other circumstance rendering Seller's Representative unable to fulfill his responsibilities hereunder.

* * * * * * *

DM_US 31372147-16.054265.0520

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

INVENSYS RAIL CORPORATION

By: _John J. Paige_
Name: John J. Paige
Title: President, IRC

_____
JOHN HARRISON

_____
LINDA L. HARRISON, SPOUSE, who agrees to be jointly and severally liable with Harrison for all obligations of Harrison and agrees to the appointment of and provisions regarding the Sellers' Representative in Section 12.15

_____
HARRY NAGEL

_____
KATHLEEN L. NAGEL, SPOUSE, who agrees to be jointly and severally liable with Nagel for all obligations of Nagel and agrees to the appointment of and provisions regarding the Sellers' Representative in Section 12.15

Signature Page to Stock Purchase Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

INVENSYS RAIL CORPORATION

By:_____
Name:
Title:


_____
JOHN HARRISON

_____
LINDA L. HARRISON, SPOUSE, who agrees to be jointly and severally liable with Harrison for all obligations of Harrison and agrees to the appointment of and provisions regarding the Sellers' Representative in Section 12.15


_____
HARRY NAGEL

_____
KATHLEEN L. NAGEL, SPOUSE, who agrees to be jointly and severally liable with Nagel for all obligations of Nagel and agrees to the appointment of and provisions regarding the Sellers' Representative in Section 12.15


Signature Page to Stock Purchase Agreement

# EXHIBIT B

May 9, 2012

<u>**Private and Confidential**</u>

Harry Nagel
3000 McCully Road
Allison Park, Pennsylvania 15101

Dear Harry:

Conditioned on the Closing of the acquisition by Invensys Rail Corporation ("Invensys") of all of the outstanding shares of PHW, Inc. ("PHW"), I am pleased to confirm our offer of employment to you with PHW, a wholly owned subsidiary of Invensys and a part of Invensys' Rail North America business unit ("IRNA"). You will report to John Paljug, President, IRNA. Your title shall be BU Senior General Manager of the PHW business unit. Your title for external purposes shall be Vice President, General Manager of the PHW business unit. Under the terms of this offer, you will be located at the PHW facility in East Pittsburgh, Pennsylvania, that Invensys will assume upon the Closing of the PHW acquisition.

Your compensation & benefits package includes:

1. <u>**Cash Compensation**</u>

Your annual base salary will be $180,000, paid at the bi-weekly rate of $6,923.07.   All compensation shall be subject to income tax withholding and other payroll tax deductions required by applicable law or as otherwise authorized in writing by you.

2. <u>**Leadership Performance Program ("LPP")**</u>

You will be eligible to participate in the Invensys Leadership Performance Program [LPP] for FY 2013 with a bonus target of 30% of your annual base salary. You should note that bonus payments are non-pensionable. The bonus plan year for FY2013 commences on 1st April 2012. If the commencement date of your employment is later than 1 April, any bonus payment will be pro-rated for the number of months worked in the fiscal year.

The specific LPP objectives are outlined on the Bonus Scorecard for IRNA that will be provided to you. You will note that the LPP bonus award is contingent upon meeting a number of financial criteria that are listed on the scorecard and include achievement of your personal objectives.

Invensys may vary or withdraw the scheme at any time and ongoing participation is dependent upon your personal performance and contribution.

3. <u>Other Terms</u>

  ▪ For the remainder of 2012 calendar year, you will continue to be eligible for vacation as per your current PHW Vacation Policy. Beginning 1/1/2013 your vacation eligibility will be grandfathered based on your current vacation entitlement and remain as such until it reaches alignment with IRNA's Vacation Policy. The actual dates requested for vacation will be subject to my approval.  Such vacation days will be in addition to Company recognized holidays.

  ▪ Commencing January 1, 2013, you will be eligible to participate in all standard benefits for employees of IRNA, subject to the terms of participation in those plans.  Details of these benefits including medical, dental, and life insurance programs will be provided to you separately.

  ▪ You will also be entitled to sick leave in accordance with IRNA's written policy as maintained and amended by IRNA from time to time.  Please note that you will not be paid for unused sick leave and any sick leave unused by the end of each calendar year will be forfeited.

4. <u>Duties</u>

DM_US 34156381-1.054265.0520

As General Manager of the PHW Business Unit, your duties for the PHW Business Unit shall include general control over the P&L of the PHW Business Unit including but not limited to (i) hiring, firing and compensation (in accordance with Invensys guidelines), (ii) primary interface to PHW customers, including existing and new PHW customers obtained during your term as General Manager, (iii) decision making authority to determine on which projects to bid on or engage in and to staff, manage and allocate resources from the PHW business unit for such projects accordingly, and (iv) participate in negotiations of contract requirements, terms and conditions.

## 5. Severance

Should your employment be terminated (i.e. for "Cause", "Disability" and/or "Good Reason" as defined below), you will be paid such severance benefits as follows:

- If your employment is terminated for "Cause", no severance will be payable and your entitlement to salary, bonuses, benefits or other compensation shall cease upon termination of your employment.
- If you terminate your employment by resignation without "Good Reason," no severance will be payable and your entitlement to salary, bonuses, benefits or other compensation shall cease upon termination of your employment.
- If your employment is terminated by IRNA due to "Disability" or for other than "Cause," or on your resignation for "Good Reason," you shall be entitled to the following:
    a) If the termination occurs during a period of up to two (2) years from the date of the commencement of your employment, you will be entitled to three (3) years of base salary as of the effective date of termination. Such payments will be made via pay continuation over the applicable period following such termination.
    b) If the termination occurs during a period of greater than 2 years but less than 3 years from the date of commencement of employment, you shall be entitled to two (2) years of base salary as of the effective date of termination. Such payments will be made via pay continuation over the applicable period following such termination.
    c) If the termination occurs during a period of greater than 3 years but less than 5 years from the date of commencement of employment, you shall be entitled to one (1) year of base salary as of the effective date of termination. Such payments will be made via pay continuation over the applicable period following such termination.
    d) Additionally, in each case described in Section 5(a) through 5(c) above, you will be provided with the opportunity to maintain your existing medical and dental coverage under COBRA with premiums for the initial six (6) months after the date of such notice at the same employee premium rates as provided to active employees unless you begin employment with another employer prior to the expiration of six (6) months from the date of termination of your employment. For purposes of clarity, in each case described in Section 5(a) through 5(c) above, Invensys will pay the COBRA premium for a period of six (6) months from the effective date of termination of your employment.
- If your employment is terminated by the IRNA for other than "Cause", during a period after five (5) years from the date of the commencement of your employment, you will be entitled to severance in accordance with the standard severance policy of IRNA. In calculation of "standard severance", you shall be given credit for your term of employment with PHW prior to acquisition by Invensys.
- Termination of your employment based on "Good Reason" or termination by IRNA for other than "Cause" as defined below shall not impact your opportunity to obtain an Earn Out per the terms of the Share Purchase Agreement executed between Invensys and the shareholders of PHW.

"Cause" is defined as gross misconduct, unlawful conduct or use of Company Information or property, misappropriation of IRNA assets, conviction of a misdemeanor involving moral turpitude or a felony, intentionally or negligently engaging in illegal business practices in connection with IRNA business, willful violation of Company written policies or procedures, or work performance that consistently fails to meet minimum reasonable requirements after prior written warning of such performance.

"Disability" means you are substantially unable to perform your essential duties and responsibilities as an employee of IRNA, with or without accommodation, by reason of illness, injury or other incapacity for a period of six (6) consecutive months, or for more than six (6) months in the aggregate during any twelve (12) month period.

"Good Reason" for your resignation from employment with IRNA shall mean any of the following without your prior written consent: (a) a material diminution to your title, salary or authority, unless such diminution is

based on your poor performance as previously documented in writing by IRNA, (b) any change in reporting responsibility so that you report to any person other than the President of the Invensys Rail North America business unit so long as there is a President of the IRNA business unit or (c) a forced relocation of your principal place of business to a location more than twenty five (25) miles from PHW's current office in East Pittsburgh, Pennsylvania. For purposes of clarity, a material diminution in your authority shall include a material change in your duties as described in Section 4 ("Duties") above. Notwithstanding the foregoing, however, any condition or conditions otherwise set forth herein shall not constitute Good Reason for termination unless (i) you provide written notice to IRNA of the condition claimed to constitute grounds for Good Reason within thirty (30) days of the initial existence of such condition, and (ii) the condition is not remedied within fifteen (15) days of such notice. In circumstances where the condition is a gradual one that does not arise from one specific incident, you need to give Invensys written notice as soon as possible and Invensys shall have thirty (30) days to cure such condition.

In consideration of and as a condition precedent to receiving any of the payments and benefits described in this "Severance" section, you agree you will execute and deliver to Invensys and not revoke a release, and IRNA will execute and not revoke a release (except in instances of your fraud) in the form attached as Exhibit A.

## 6. Restrictions on Competition

During the term of employment with IRNA, you shall not directly or indirectly for yourself or on behalf of any other person, corporation, firm, partnership, associates or any other entity (whether as an individual, agent, servant, employee, employer, officer, director, shareholder, investor, lender, financer, principal, consultant or in any other capacity) solicit, divert, or attempt to divert any person or business entity who or which is a former, current or prospective customer of IRNA for the purpose of the sale of or otherwise providing any products and/or services which are or will be in direct or indirect competition with the products and/or services of IRNA; provided that "prospective" customers shall only include those persons whom IRNA has identified and made initial contact with prior to the later of the date of the termination of my employment by IRNA.

You also agree for a period of two (2) years following termination of your employment with Invensys (the "Restricted Period"), you shall not, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be employed or retained by, render services to, provide financing (equity or debt) or advice to, or otherwise be connected in any manner with any business that provides (i) software, diagnostic products, signaling products, solutions or services to the rail market, or (ii) provides related customer support and services to the rail industry. Notwithstanding the foregoing, if the stock or substantially all of the assets of the PHW are sold, assigned or transferred to a party which is not an affiliate of Invensys on a standalone basis (*i.e.*, pursuant to a transaction in which PHW constitutes substantially all of the stock or assets being sold and not as part of a sale of Invensys or any of its direct or indirect parent companies) within three (3) years after the date hereof, the two (2) year periods set forth in this Section 6 and Section 7 shall expire six (6) months after the consummation of said sale, assignment or transfer.

You also acknowledge and agree that the scope described in the above paragraph is necessary and reasonable in order to protect IRNA in the conduct of its business and that, if you become employed by another employer, you shall be required to disclose the existence of this offer of employment and other agreements, letters, documents etc., executed between you and IRNA, during the course of your employment with IRNA, to such employer and you hereby consent to and IRNA is hereby given permission to disclose the existence of this offer of employment and other agreements, letters, documents etc., executed between you and IRNA to such employer. You further acknowledge that these covenants are tailored narrowly to protect legitimate and protectable interests of IRNA and compliance herewith will not impose an unreasonable burden on your ability to earn a living.

You further acknowledge and agree that this offer of employment including, without limitation, the restraints imposed upon you pursuant to this offer of employment does not constitute an agreement by which you are restrained from exercising a lawful profession, trade or business of any kind. You acknowledge and agree that any breach or anticipated or threatened breach of any of your covenants contained in this offer of employment will result in irreparable harm and continuing damages to IRNA and its business and that IRNA's remedy at law for any such breach or anticipated or threatened breach will be inadequate and, accordingly, in addition to any and all other remedies that may be available to IRNA at law or in equity in such event, any court of competent jurisdiction may issue a decree of specific performance or issue a temporary and

permanent injunction, without the necessity of IRNA posting bond or furnishing other security and without proving special damages or irreparable injury, enjoining and restricting the breach, or threatened breach, of any such covenant, including, but not limited to, any injunction restraining you from disclosing, in whole or part, any confidential information. You acknowledge the truthfulness of all factual statements in this offer of employment and agree that you are stopped from and will not make any factual statement in any proceedings that is contrary to this offer of employment or any part thereof. The parties also agree that the prevailing party shall be entitled to reimbursement for costs and expenses, including reasonable attorneys' and accountants' fees, incurred in successfully enforcing or defending, as the case may be, such covenants.

For purposes of this Section 6 ("Restriction on Competition") and Section 7, below ("No Solicitation of Company Employees"), "IRNA" shall mean Invensys Rail North America, its subsidiaries, affiliates, business units (including the PHW business unit) and its parent company.

## 7. No Solicitation of Company Employees

During the term of your employment and for a period of two (2) years following termination of your employment for any reason, you shall not directly or indirectly solicit, interfere with, induce or encourage any employee of the IRNA to: (i) become employed by any direct or indirect competitor IRNA; (ii) become a consultant or representative to any direct or indirect competitor of IRNA; or (iii) terminate his or her employment relationship with IRNA.

## 8. Prior to Your Start Date

This offer is contingent on

- The Close of the acquisition of PHW by Invensys within the timeframe agreed to by the parties in the Agreement.
- You not having entered into a signed agreement with a previous employer that contains a non-competition clause that might affect your ability to accept employment with Invensys or any entity thereof. If you have entered into such an agreement, you need to forward a copy of the agreement to my attention prior to any further action on this offer.
- Your ability to comply with Immigration and Naturalization Service requirements by providing verification of your employment eligibility in the United States is required.

## 9. Orientation Information

You will be required to sign a confidentiality and non-disclosure agreement upon your employment. You also shall be required to sign the "Anti-Bribery/Anti-Corruption/Code of Conduct" of Invensys. This is an on-line program, the link for which will be sent to you after commencement of your employment. Your acceptance of these Policies is also deemed to be a part of the employment terms at IRNA.

## 10. General Terms

The terms of this letter shall be interpreted, governed by and construed by the laws of Pennsylvania. If any one or more provisions of this letter are held to be invalid or unenforceable, the validity and enforceability of the remaining provisions shall not be affected thereby.

To confirm your acceptance of this offer, please sign below and return the one copy to me as soon as possible. The extra copy is for your files.

I am extremely excited that you have decided to join our team and look forward to working with you.  I am confident you will make a significant contribution and enjoy being a part of the Invensys team.

Sincerely,

John Paljug
President
Invensys Rail North America


Accepted: _____

Date: _____

Start Date: _____


Signature Page to Nagel Employment Agreement

I am extremely excited that you have decided to join our team and look forward to working with you.  I am confident you will make a significant contribution and enjoy being a part of the invensys team.

Sincerely,


John Paljug
President
Invensys Rail North America

Accepted: _____

Date: _____

Start Date: _____


Signature Page to Nagel Employment Agreement

**Exhibit A**

1.   **Background.** This <u>Exhibit</u> A is an exhibit to the Employment Agreement (the "Agreement") entered into between IRNA and You (defined herein as either "You" or "Employee").

2.   **Release of Claims.** In exchange for the benefits and payments described in the Agreement, the sufficiency of which is expressly acknowledged, you hereby irrevocably and unconditionally release, waive and fully and forever discharge IRNA, and IRNA hereby irrevocably and unconditionally releases, waives and fully and forever discharges you, from and against any and all claims, liabilities, obligations, covenants, rights, demands and damages of any kind whatsoever, whether known or unknown, anticipated or unanticipated, related to or arising out of any agreement, act, omission, occurrence, transaction or matter up to and including the date of this Agreement, including without limitation, any and all claims relating to or arising out of actions undertaken in the course and scope of Employee's employment by IRNA or the termination thereof.

3.   **Non-Disparagement.** You agree and covenant (i) not to disparage any person, company or entity employed by or under the control of IRNA, (ii) to do nothing that could adversely affect the goodwill or reputation of IRNA, and (iii) to do nothing that could adversely affect morale of employees of IRNA. IRNA agrees and covenants (i) not to disparage you and (ii) take no action that could adversely affect your reputation or employment prospects. Each party will refrain from doing any of the foregoing by any means, including without limitation any electronic, computer-based, Internet, e-mail or other mode of communication whatsoever.

4.   **Transition.** You will make every effort to ensure a smooth transition, and agrees to cooperate with IRNA and to provide all necessary information regarding the status of operations, the location of relevant materials, and any other relevant information of which IRNA should be aware or which IRNA may request, now or at any later time. IRNA agrees that it will respond to any inquiry with respect to Employee by giving the dates of employment and last position held, unless otherwise authorized by employee in writing or as required by subpoena or court order.

5.   **Return and Prohibition of Removal of Company Property and Records.** Employee agrees to return any IRNA property within five days of the execution of this Agreement. Failure to return such property shall be a material breach of this Agreement, the consequence of which shall be that Employee shall immediately forfeit any remaining unpaid benefits under this Agreement and, in addition, Employee shall be liable to IRNA for the value of all such property and all reasonable costs, including attorneys' fees, incurred by IRNA in having to recover such property. Employee further agrees that IRNA equipment, files or business information of any kind, whether written, electronic, digital, or otherwise, shall not be copied, taken or otherwise used by Employee without prior written approval of IRNA.

6.   **Severability.** In the event that any clause, provision or paragraph of this Exhibit is found to be void, invalid or unenforceable, such finding shall have no effect on the remainder of this Agreement, which shall continue to be in full force and effect. Each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

# EXHIBIT C



Harry C. Nagel
3000 McCully Road
Allison Park, PA 15101

February 14, 2014

Re:     Employment Agreement
        Dated May 9, 2012

John Paljug, President                          Kim Taylor
Invensys Rail North America and                 Invensys Rail Corporation
Siemens Rail Automation Corporation             2400 Nelson Miller Pkwy
664 Linden Ave                                  Louisville, KY 40223
East Pittsburgh, PA 15112

Dear John and Kim:

     I am writing to provide written notice to Siemens Rail Automation Carborne Systems Inc. (formerly PHW, Inc.,) a wholly owned subsidary of Invensys Rail Corporation, which is now a wholly owned subsidary of Siemens Industry, Inc. ("Employer") of certain matters in connection with my employment agreement referred to above.

     Recent changes and decisions constitute a material change of my duties and a material diminution of my authority as Senior General Manager of the PHW Business Unit ("BU").  Specifically:

     1.    <u>Control of Purchasing</u>.  Employees of the BU have been told that they are required to obtain the approval of the Purchasing Department in Louisville, which has attempted to override my decisions to proceed with certain purchases.  General control over the P&L of the BU, and specifically including decision making authority to allocate resources of the BU for projects, has always been within my duties, until these recent events.

     2.    <u>Outsourcing of Manufacturing</u>.  Control of decisions regarding the continuation of in-house production of PCBs and wiring harnesses and/or relocating all BU production to a leased facility has been assigned (by someone other than me) to Jamie Daugherty as Head of Operations.  He has told me directly that he has full responsibility in this matter.  Again, decisions of this nature have always been within my duties, until recently.

    3.     <u>Control of the Joint MTA PTC Project</u>.  I have learned that your Head of Program Management (Doug Dreisbach) has conferred complete P&L responsibility for this project to a Project Manager, Kim Anderson.  This project is the largest project currently running at PHW.  A decision to delegate authority on a project of this magnitude is clearly within my duties as Senior General Manager of the BU, but this decision was made by others, indicating that I did not have this authority to begin with, which is clearly inaccurate.

    4.     <u>Changing the ERP System</u>.  I have made known my concerns about requiring the BU to move from our present Macola ERP system to the SAP system run by Siemens.  In addition to the direct costs of acquiring the new system, the training and implementation will require significant allocation of resources and manpower, which will be difficult if not impossible to fully account for.  This decision will clearly have a serious impact on the P&L of the BU during the installation and implementation process.  If the BU is required to proceed with this implementation, over my objections, it is a clear indication that my duties have changed and my authority has diminished materially.

    All of the specific conditions noted above have arisen within the last thirty (30) days.  In addition, they are a continuation of a gradual diminution of my authority since Siemens acquired Invensys last year.

    I am requesting that the company clearly demonstrate that my previous authority as Senior General Manager of the BU has not been diminished.  Therefore, unless the first three specific conditions described above are remedied and the company provides me with control over the decision noted in the fourth specific condition within fifteen (15) days of this notice, and the general diminution of my authority is remedied within thirty (30) days, these conditions shall constitute "Good Reason" for me to resign from my employment.

Sincerely,

Harry C. Nagel

/133743

# EXHIBIT D

# SIEMENS

**Infrastructure & Cities**

February 25, 2014

Harry C. Nagel
3000 McCully Road
Allison Park, PA 15101

Re:        Employment Agreement dated May 9, 2012

Dear Harry:

This letter is in response to your letter dated February 14, 2014, which I received on Monday, February 17, 2014, and hopefully, will alleviate your concerns. The conditions described in your letter reflect our current business conditions and operating procedures and do not rise to the level of a material change in your duties or a material diminution in your authority over the PHW business unit, which is now known as Siemens Rail Automation Carborne Systems ("SRACS"). We need you, and it is not Siemens Industry, Inc.'s, or my intent to materially change your duties or authority as described in the Employment Agreement. Thus, the conditions described in your letter are not "Good Reason" for you to resign under the Employment Agreement, and I look forward to our continued relationship and working together in the future. We will address each issue mentioned in your letter below.

1.  <u>Control of Purchasing</u>:  While the supply chain function is centralized within the Siemens organization, direction for the group comes from all parts of the organization including you and the rest of SRACS management.  There is a supply chain representative embedded in SRACS, and you have direct access to both the Procurement Specialist as well as his manager.  Additionally, supply chain actions can be initiated and reviewed by management, and you continue to have authority over the SRACS projects for which supply chain is making purchases.  The supply chain organization is beneficial to SRACS because management no longer has to focus on day-to-day purchasing tasks, and SRACS has received and will continue to receive numerous benefits as a result of being a part of Siemens given the buying power of its supply chain organization.

2.  <u>Outsourcing of Manufacturing</u>:  There has been no material change in your duties or authority as it relates to SRACS manufacturing.  Our plan is for the production of PCBs, wiring harnesses, and certain other production to be done by Siemens, not an outside third party, which does not represent the outsourcing of manufacturing.  Reorganization of the manufacturing plan is a necessity given the recent contracts won with SRACS content and the integration of Invensys Rail into Siemens.  The integration together with the augmented volume has led to the need to bring processes into alignment with Siemens standards while increasing the engineering and manufacturing capacities for the SRACS business.  It cannot escape notice that you are a partner in the ownership of the building leased by SRACS.  As such, you must recognize that you have a conflict of interest when it comes to decisions related to the use of the building.  The current plan results in the continued use of the building for the necessary expansion of engineering resources while allowing the expansion of the manufacturing footprint due to business necessity.  You will continue to have a key role in manufacturing decisions, including the move to the new manufacturing facility which you have supported, and authority over SRACS projects.

3.  <u>Control of the Joint MTA PTC Project</u>:  The MTA PTC Project is being treated no differently than other Rail Automation projects.  Project management throughout Siemens Industry Inc. and Siemens Rail Automation reports into the project management organization.  Irrespective of the organizational structure, responsibility for the SRACS portion of the project rests with you.  Furthermore, you hired and assigned the project manager, Kim Anderson, who is responsible MTA PTC Project. The project reviews are done with you and you are involved in the decision making process with respect to the project.  Additionally, the MTA PTC Project contains Siemens Rail Automation content in addition to that of SRACS, which results in the need for collaboration and combined project management.  This approach does not result in a reduction of your authority with respect to the delivery of the SRACS content.

4.  <u>Changing the ERP System</u>:  A change in an accounting and reporting system does not materially change your duties or authority as it relates to the management of SRACS.  As noted above, certain processes including the ERP system must be revised given the integration of Invensys Rail into Siemens. The existing ERP system is insufficient to handle the needs of the growing SRACS business and changes to the ERP are a business necessity.  In fact, in the past, you have supported necessary integration efforts including modifications to the ERP system and stated that you believed that movement to SAP was the right step for the business.   You will be on the team, which will help with implementation and assist with minimizing any unfavorable impact on the business.

Furthermore, more generally, the specific duties outlined in the Employment Agreement including general control over the P&L of SRACS have not materially changed including but not limited to:

* Hiring, Firing and Compensation in accordance with corporate guidelines;

Siemens Rail Automation Corporation
Infrastructure & Cities Sector

2400 Nelson Miller Parkway
Louisville, KY  40223
USA

Tel.: +1-502-618-8800
Fax: +1-520-618-8810
www.usa.siemens.com

# SIEMENS

**Infrastructure & Cities**

- Primary interface to PHW customers;
- Decision making authority to determine which project to bid on or engage in and to staff, manage and allocate resources from the PHW business unit for such projects accordingly; and
- Participate in negotiations of contract requirements, terms and conditions.

As such, conditions do not exist allowing you to terminate your employment contract for Good Reason.

Harry, I welcome an open continued dialogue with you and I look forward to working closely with you to effectively integrate our teams to support the business growth and success.

Sincerely,

John J. Paljug
CEO
Siemens Rail Automation
North American Region

# EXHIBIT E

| | |
|---|---|
| **From:** | Harry Nagel [HCNagel@PHWINC.COM] |
| **Sent:** | Sunday, July 13, 2014 11:13 PM |
| **To:** | John Paljug |
| **Cc:** | Kim Taylor <Kim.Taylor@siemens.com |
| **Subject:** | Further evidence of diminution of my responsibilities |

John and Kim,

A little over a month ago I was informed that there would be an audit occurring at Siemens East Pittsburgh facility (formerly PHW) and that my presence was not necessary because it wouldn't involve me.  Recently, I received a copy of the report issued as a result of that audit.  In reading that report I noticed that it brought up several of the issues that I had mentioned in my letter to you of Feb 25, 2014 where I identified the fact that my control over the Purchasing and Manufacturing departments has been materially diminished.

Among other things, the audit identified three things that all support my earlier conclusion concerning the material diminution of my responsibilities:

1)  The report states that, "The report is distributed among others to the management of the reviewed unit" and yet the only reason I have a copy was because someone who was on the distribution list was kind enough to forward it to me.

2)  The report states that, "Most of the management and support functions (i.e. Compliance, Legal, Procurement, QM, EHS, etc.) are handled from the global headquarters of IC MOL RA FP located in Louisville, KY or at the regional level, RC-US IC MOL RA, located in New York, NY wherein most of the operational functions are performed at the Pittsburgh facility."

3)  "RC-US L MOL completed and emailed payment approval instructions to PHW management."  I can't find any record of having ever received any such documentation from the legal department.

There are two additional conclusions that can be drawn by what was (and was not) written:

1)  The report states that the review team "received full support in the provision of documents and information".  (But I never met with the auditors nor did they ever ask to talk to me.)

2)  I was not included in the email distribution list of the report by the audit team.  (But many other people in management from below my level to above my level were on the list.)

It is clear that when Invensys was acquired by Siemens, we became part of a much larger organization.  It is equally clear that regardless of whatever you and I think, the organization that we are both part of does not think that I have management responsibilities in the area of manufacturing or purchasing (or the other areas mentioned in the report).  Given that I had complete control over both of these functions before as an owner and President of PHW, this alone represents a material diminution of my responsibilities.  Please let me know if you can refute my claims of diminished authority through the production of any "corporate" evidence that establishes the fact that I have retained control over either the Purchasing or Manufacturing departments.

1

Thanks for your attention to this matter.  The reason for sending the email was because I wanted to get this into your hands over the weekend.  I'll be following it up with an "official" copy in the next day or two.

Sincerely,
Harry

\-\-

---

DISCLAIMER:    The information contained in this email may be confidential and is intended solely for the use of the individual or entity to whom it is addressed. Access, duplication, distribution or other use of this email or information contained herein by any other individual or entity is prohibited. If you have received this email in error please reply to the sender immediately.

# EXHIBIT F

# SIEMENS

**Infrastructure & Cities**

July 29, 2014

Harry C. Nagel
3000 McCully Road
Allison Park, PA 15101

Re:     Letter dated July 14, 2014

Dear Harry:

We have received your letter of July 14, 2014. We are sorry that you continue to believe and assert that there has been a material diminution of your authority. We continue to maintain that there has not been a material change in your duties or authority. As we have outlined why in previous correspondence, we will not restate it here. The operational review conducted was a routine one within Siemens and was conducted from outside of the business unit by a separate group.

In my last two letters, I stated that that we welcome an open continued dialogue with you so that we can ensure that your concerns are being sufficiently addressed moving forward. Instead of bringing your concerns to me in a productive manner, you continue to choose to send letters which is not conducive to quick resolution of any issues. I ask that you raise your concerns with me when you feel your authority is being diminished so that it may be addressed if appropriate. You have direct access to me. You are invited to my staff meetings and you are aware of activities within the business. You are invited to project reviews and have been invited to involve yourself in business related activities. As a business leader, it is up to you to decide what level of participation you require and let me know when there are issues.

If there are specific issues that you would like to discuss further at this time, please feel free to contact me.

Sincerely,

John J. Paijug
President
Siemens Rail Automation
North American Region

Siemens Industry Inc.
Infrastructure & Cities Sector

2400 Nelson Miller Parkway
Louisville, KY  40223
USA

Tel.: +1-502-618-8800
Fax: +1-520-618-8810
www.usa.siemens.com